**Robert Arthur HART, Petitioner–Appellant,**

v.

**ATTORNEY GENERAL OF THE STATE OF FLORIDA, Secretary for the Department of Corrections, Respondents–Appellees.**

**No. 01–15571.**

United States Court of Appeals, Eleventh Circuit.

March 5, 2003.

Lisa Walsh, Miami, FL, for Petitioner–Appellant.

Paulette R. Taylor, Miami, FL, for Respondents–Appellees.

Before TJOFLAT and KRAVITCH, Circuit Judges, and VINSON,[*] District Judge.

TJOFLAT, Circuit Judge:

## I.

### A.

On July 20, 1994, Robert Hart, the appellant; James Leonard, III; Jyri Quinland; Nelson Vargas; and Jason Monte–Perini were indicted by a Dade County, Florida, grand jury following the July 3, 1994 armed robbery of Elite Photography Studio ("Elite")—a private club in North Miami Beach where customers paid to watch and photograph models in various states of undress—which led to the deaths of Todd Klein and Yohanna Fleites, Elite's manager and one of its models, respectively. Each defendant was charged with two counts of first degree murder, armed robbery, burglary with assault or battery therein while armed, and unlawful possession of a firearm while engaged in a criminal offense. The defendants were also charged with the armed kidnaping of Aneschka Culmer, another model at Elite, who was the only witness and survivor of the armed robbery.[1]

The defendants were tried separately in the Dade County Circuit Court.[2] Following a jury trial in November 1997,[3] Hart was convicted on all counts.[4] Hart's conviction was based primarily on a taped statement given to police in which he confessed to participating in the robbery, and physical evidence which discredited the portion of Hart's statement in which he denied killing Klein and Fleites. The only other evidence presented by the prosecution which linked Hart to these crimes was Hart's fingerprint which had been found on the outside of the door to Elite. Culmer, the only eyewitness, was not available to testify at Hart's trial, and Hart's co-conspirators were not called as witnesses.

---

[*] Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

[1.] Leonard, Quinland, and Monte–Perini were charged with an additional count of armed robbery against Culmer. Leonard and Quinland were also charged with tampering with a witness for threatening Culmer to prevent her from communicating to law enforcement what she had witnessed at Elite.

[2.] The district court order denying Hart's habeas petition indicates that the other defendants were convicted, but the record before us does not indicate when they were convicted or on what charges.

[3.] Hart was first tried in September 1997, but the court declared a mistrial.

[4.] On January 14, 1998, the circuit court found Hart not guilty of armed kidnaping notwithstanding the jury verdict, and entered an order vacating his conviction with respect to that charge.

Prior to trial, Hart moved to suppress his statements because they were not given voluntarily as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The circuit court conducted an evidentiary hearing on Hart's motion to suppress.[5]

The suppression hearing revealed that the Metro–Dade police learned of Hart's involvement in the robbery at Elite after talking to Culmer. Culmer provided them with a description of each of the five participants, names she overheard, and a description of the truck they were driving. She also told the officers that one of the participants, whom the others referred to as "Rolex," said that his wife used to work as a model at Elite. Acting on this information, the police found an employment application in Elite's files which was filled out by a woman who listed "Rolex" as her last name. Detectives matched the address on this employment application to the residence of Leonard. The police connected Hart to Leonard because they had recently been arrested together for stealing Hart's grandparents' credit cards. Culmer identified Leonard and Hart as participants in the robbery and homicides from photographic lineups.

### B.

Hart was the first suspect to be brought in for questioning. Detective Hill testified that he was chosen to bring Hart in for questioning on July 4 because he already knew Hart from his investigation of the credit card case. Hill called Hart's grandparents' house, where Hart lived,[6] to confirm that he was home, and explained to Hart's grandmother that he wanted to bring Hart to the police station to talk

about the credit card case, which was still pending. He then drove to the grandparents' house and asked Hart to accompany him to the police station to talk about the credit card case, which Hart agreed to do. Hill did not tell Hart or his grandparents about the homicide investigation.

Hill testified that, after arriving at the police station, he and Hart discussed the credit card case for five to ten minutes. Hill told Hart that he had to stay out of trouble because Hill was going to talk to the state attorney about getting Hart into a diversion program or probation in lieu of jail time for the credit card theft. As he was leaving the room, Hill told Hart that Detective Mauer wanted to speak to him about another case, but he did not tell Hart what the nature of the other case was. Hill did not tell Hart that he was free to leave.

Detective Mauer also knew Hart from a previous investigation (a sexual abuse case in which Hart was the victim). Mauer testified that before asking Hart any questions, he had Hart sign a *Miranda* rights waiver form. Mauer testified that he explained to Hart one by one each right listed on the form: (1) that he had the right to remain silent; (2) that anything he said could be introduced into evidence against him in court; (3) that he had the right to have an attorney to represent him at any time during questioning; and (4) that if he wanted an attorney but could not afford one, one would be provided without charge. After Mauer explained each right, Hart put his initials next to "yes" to indicate that he understood the right. Mauer then directed Hart's attention to a question on the form asking whether he was willing to answer questions at this time

---

**5.** Hart's co-defendants also filed motions to suppress statements and other evidence. The circuit court conducted a single hearing on all of the motions.

**6.** Hart was only seventeen at the time, and his grandmother was his legal guardian.

without the presence of an attorney; he explained that Hart could put his initials next to "yes" if he was willing to answer questions, and Hart did so. Mauer then asked Hart to sign at the bottom of the form beside a statement indicating that he signed the form of his own free will without any threats or promises having been made to him. Mauer brought Sergeant Perez into the interview room to witness Hart's signature on the waiver form.

Mauer testified that after Hart signed the Miranda rights waiver form, he told Hart that he was investigating a homicide that occurred at a photo place, and he wanted to find out what Hart knew about it. Hart said that he knew nothing about it. Mauer then told Hart that a witness had identified him from a photographic lineup. Hart then asked to speak to Jodi Schuster, a detective whom Hart knew because she worked with juveniles and gangs in his neighborhood. Mauer testified that Hart did not ask to speak to a lawyer[7] or to his grandparents.[8] After Hart requested to speak to Schuster, Mauer stopped questioning him and left the interview room to arrange for Schuster to come to the police station to talk to Hart.

Schuster testified that when she arrived, Hart told her that he asked to speak to her because he thought of her as a friend. He told her that he thought she would tell him the truth, and she told him that she had never lied to him in the past, and she would not lie to him now. In fact, she did lie to him about there being a video camera at Elite that had recorded the robbery and the killings. She testified that her purpose in lying about the video camera was to ensure that Hart told her the truth.

Hart asked her if he was in big trouble, and she answered that he was in "the biggest trouble [he] could ever be in."[9] Hart asked what could happen to him, and she told him that he could be given the death penalty if he were tried as an adult, which she believed was very likely. Hart asked Schuster whether she would get an attorney if she were in his shoes, and she told him that she could not answer that question, that he had to make his own decision. She told him to think about what he wanted to do and left the room for approximately five minutes to give him time to think about it.

Schuster testified that when she came back to the room, Hart said, "Let's get started." Hart then asked her what the pros and cons of having an attorney were in her opinion. She said that in her opinion the pros of having an attorney were "He'll protect your rights. He'll tell you what to answer, what not to answer, and he'll be here for you." She told him the con in her opinion was "I'm going to want to ask you questions and he's going to tell you you can't answer me."

Schuster did not re-Mirandize Hart. She testified that she did not indicate to Hart that she would keep what he said to

---

7. Hart testified that he did ask Mauer for a lawyer, but Mauer ignored his request, so he asked for Schuster because he trusted her. He testified that he also told Schuster several times that he wanted a lawyer, but Schuster also ignored his requests, and he confessed because he felt he had no alternative after his requests for a lawyer were denied. The circuit court found that Hart's testimony that he made several requests for a lawyer was not credible.

8. Hart's grandmother arrived at the police station while Hart was talking to Schuster. Mauer explained to her that Hart was being interviewed about a murder case. No one informed Hart that his grandmother was at the police station until after he gave a statement.

9. Schuster's quotations are taken from her testimony at the suppression hearing.

her confidential. She told him that whatever he told her she was obligated to repeat to the prosecutor, the judge, his attorney, and anyone else involved in the investigation who asked. She testified that she did not use the word "cooperate" and never told Hart that giving a statement would help his present situation, but she also testified that she told him "honesty wouldn't hurt him." She did not tell Hart that he was free to leave because she did not believe he was.

Schuster testified that after she told Hart her opinion of the pros and cons of having a lawyer, Hart again said, "Let's get started." Hart then gave an incriminating statement to Schuster. He repeated this statement a few minutes later with both Schuster and Mauer in the room. This second statement was recorded. At Hart's trial, Schuster testified to the contents of Hart's initial statement (which she called a "pre-interview"), and the taped statement was played for the jury.

### C.

In his taped statement, Hart said that it was Leonard's idea to go to Elite on July 3, 1994 to watch models undress. Leonard told Hart to get his grandmother's credit cards so they could pay for this activity. When they arrived at Elite, Todd Klein told them that Elite did not accept their credit cards. Leonard told Klein they would go to an ATM to get money and come back. Hart said that after they left Elite, Leonard suggested that they go back and rob the place. Hart, Quinland, and Vargas were opposed to this idea at first, but Leonard convinced them to do it. Hart said that he was supposed to stay in the truck while the others went in, but when they arrived at Elite, Leonard made everyone go inside.

The group had two firearms. Leonard was carrying one which Hart said did not

work, and Monte–Perini was carrying the other—a .22 caliber rifle. Once they were inside, Monte–Perini gave the rifle to Hart. Leonard pointed his firearm at Klein's head and told him this was a robbery. Leonard told Hart to watch Klein, Fleites, and Culmer with the rifle in one room while the others looked around the rest of the club for things to steal. Quinland took Culmer out of the room to talk to her when she implored them not to hurt her because she had a young. child. After searching for things to steal, Leonard came back in the room and took Fleites down the hall, leaving Hart alone with Klein. Hart believed that Leonard took Fleites down the hall to rape her.

When Leonard brought Fleites back into the room a few minutes later, he threatened to kill Hart if he did not kill Klein. At this point, Leonard and Hart were the only participants still in the club. Leonard put a pillow over Klein's head. Hart said that he fired into the pillow, but deliberately missed Klein. Hart said that after Leonard discovered that Klein was still alive, Leonard shot and killed both Klein and Fleites.

Leonard and Hart then exited the club and joined the others outside. Leonard wanted to kill Culmer too, but Quinland would not let him. They drove to Leonard's house, taking Culmer and the items they stole with them. Once they were at Leonard's house, they brought the items they stole inside, and Leonard left to drive Culmer home.

After completing his account of the robbery and homicides, Hart gave names and descriptions of Leonard, Quinland, Vargas, and Monte–Perini. Schuster asked Hart if he had given the taped statement voluntarily, and he answered "yes." She asked if anyone had threatened or coerced him to make the statement, and he answered "no." She asked if anyone had made any

promises or offered a reward to make the statement, and he said "no." This concluded the taped statement.

On March 12, 1996,[10] the circuit court, relying on *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), denied Hart's motion to suppress because it concluded that his colloquy with Schuster was not an unequivocal request for an attorney.[11] In a per curiam decision filed September 8, 1999, the Florida Third District Court of Appeal affirmed without written opinion, citing as support for its affirmance *State v. Owen,* 696 So.2d 715 (Fla.1997),[12] which held based on *Davis* that "police in Florida need not ask clarifying questions if a defendant who has received proper Miranda warnings makes only an equivocal or ambiguous request to terminate an interrogation after having validly waived his or her Miranda rights." *Owen,* 696 So.2d at 719. It therefore appears that the Third District Court of Appeal affirmed the denial of Hart's motion to suppress based solely on its agreement with the circuit court that Hart's colloquy with Schuster did not amount to an unequivocal request for an attorney.

On November 3, 2000, Hart, who is now in the custody of the State of Florida under a sentence of life imprisonment, filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Southern District of Florida claiming that he is being held in custody in violation of the Fifth and Fourteenth Amendments to the United States Constitution.[13] The district court denied Hart's petition, but granted a certificate of appealability on the issue of whether Hart's privilege against self incrimination[14] under the Fifth and Fourteenth Amendments was violated when the police misled him as to the nature of that right. We now grant Hart's petition for writ of habeas corpus.

## II.

### A.

28 U.S.C. § 2254(d)(1) authorizes a federal court to grant a petition for writ of

10. For some reason, however, the circuit court's order was not recorded until August 4, 1999. Although the order did not appear in the index of proceedings which was furnished as part of the appellate record, the Florida Third District Court of Appeal did have before it transcripts of the suppression hearing when it reviewed Hart's conviction.

11. The circuit court also concluded that the deceptive means used by police to bring Hart to the police station for questioning did not nullify compliance with the *Miranda* standards, that the police did not violate Hart's rights by questioning him without his grandmother, and that the police were not obligated to contact Hart's attorney from the credit card case before questioning him. These findings are not pertinent to the determination of whether the conduct of the police during the interrogation—particularly Schuster's colloquy with Hart on the pros and cons of hiring a lawyer—resulted in an involuntary waiver.

12. The Third District. Court of Appeal also cited *Adams v. State,* 412 So.2d 850 (Fla. 1982), and *Dell v. State,* 661 So.2d 1305 (Fla.3d Dist.Ct.App.1995), to support its affirmance, but these cases involved the denial of jury instruction requests, and are thus irrelevant to the issue of the voluntariness of Hart's *Miranda* waiver.

13. 28 U.S.C. § 2254(a) provides:
    The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

14. The privilege against self incrimination is spelled out in the Fifth Amendment, which provides, in pertinent part: "No person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend. V.

habeas corpus with respect to a claim that was adjudicated on the merits in state court where the adjudication in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[15] "Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 404, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000). We conclude that, in the instant case, habeas relief is appropriate because the state court decision was contrary to clearly established federal law, as determined by the Supreme Court.

■ Writing for the Court with respect to Part II in *Williams*, Justice O'Connor explained that a state-court decision will be contrary to clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams*, 529 U.S. at 405–406, 120 S.Ct. at 1519–1520. Hart argues that the decision of the state courts is contrary to clearly established federal law, as determined by the Supreme Court, because the trial judge failed to determine whether his *Miranda* waiver was voluntary, knowing, and intelligent under the totality of the circumstances. As noted *supra*, both the state trial court and

the state appellate court determined that Hart's colloquy with Schuster was not an unequivocal request for counsel under *Davis*. Neither court, however, analyzed whether Hart's colloquy with Schuster resulted in a waiver that was not voluntary, knowing, and intelligent.

Justice O'Connor determined that the statutory phrase "clearly established federal law, as determined by the Supreme Court" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412, 120 S.Ct. at 1523. Justice O'Connor went on to explain that "[w]ith one caveat, whatever would qualify as an old rule under [the Supreme Court's] *Teague* jurisprudence will constitute 'clearly established federal law, as determined by the Supreme Court of the United States' under § 2254(d)(1). The one caveat ... is that § 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Id.* (internal citation omitted).

The Supreme Court has held—and it is therefore clearly established—that the government cannot introduce a suspect's statement taken without the presence of an attorney without first showing that the suspect made a voluntary, knowing, and intelligent waiver of his right to counsel. *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628 ("If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived

---

15. A federal court is also authorized to grant a petition for writ of habeas corpus where the adjudication on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Because we conclude that the state court's decision on the suppression issue was contrary to clearly established federal law, we need not address whether the decision was based on an unreasonable determination of facts.

his privilege against self-incrimination and his right to retained or appointed counsel."); *see also United States v. Beale*, 921 F.2d 1412, 1434 (11th Cir.1991) ("Before the government may introduce a suspect's uncounselled statement made during custodial interrogation, it must show that the suspect made a voluntary, knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel.").

Likewise, it is clearly established from holdings of the Supreme Court that the inquiry into whether a waiver was voluntary, knowing, and intelligent is twofold:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979)).

■ Hart argued in both the state trial court and the state appellate court that his waiver was not voluntary, knowing, and intelligent because Schuster misled him as to the nature of the rights he was waiving. Clearly established federal law,[16] as deter-

---

16. Judge Vinson argues in his dissent that granting the writ of habeas corpus is improper in this case because he believes that Supreme Court precedent is not clearly established on this issue. He contends that "[w]hat post-waiver statements amount to retroactive nullification of a prior valid waiver, if that is even possible, has *not* been clearly established by the Supreme Court." This difference in opinion results from our different understandings of both the phrase "clearly established" and the phrase "totality of the circumstances surrounding the interrogation." Judge Vinson appears to believe that federal law would only be clearly established on this issue if the Supreme Court had decided a case that is "on all fours" with the instant case—a case in which a suspect is advised of his rights, signs a waiver, later asks questions about hiring a lawyer, is deceived by the police, then confesses. We believe that in areas of the law, such as voluntariness of confessions, in which general principles announced by the Supreme Court will out of necessity be applied to varying factual situations on a case by case basis, it is acceptable to derive clearly established federal law from these general principles rather than waiting for bright line rules. *See Williams*, 529 U.S. at 382, 120 S.Ct. at 1507 (Stevens, J., joined by Souter, Ginsburg, and Breyer, JJ.)

("[R]ules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright line rule.") *and Wright v. West*, 505 U.S. 277, 308–309, 112 S.Ct. 2482, 2499, 120 L.Ed.2d 225 (1992) (Kennedy, J., concurring) ("If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without saying that those applications themselves create a new rule.... Where the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent."). Applying the general principle that waivers must not be the product of deception and must be fully informed to the facts of this case does not create a new rule; therefore, the law on this issue is clearly established.

Also, as noted *infra*, the dissent asserts that the waiver inquiry ends with the signing of the waiver form. Influenced by this belief, the dissent characterizes the clearly established federal law we rely on as "retroactive nullification of a prior valid *Miranda* waiver." This is not the case. Because *Moran* requires

mined by the Supreme Court, required the state courts to determine whether, under the totality of the circumstances, Hart's waiver was voluntary, knowing, and intelligent. The state courts did not do so. Instead, they only applied *Davis*, which is inapplicable to the issue of the voluntariness of a *Miranda* waiver. By only applying *Davis* when the circumstances also required the state courts to apply *Moran*'s totality of the circumstances inquiry to the issue of whether the waiver was voluntary, they failed to identify the "correct legal rule," and their decisions were thus contrary to clearly established law, as determined by the Supreme Court. *Fugate v. Head*, 261 F.3d 1206, 1216 (11th Cir.2001).

■ We now examine the totality of the circumstances, as the state courts should have done, and conclude that Hart's waiver was, in fact, the product of deception and was not "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141. In this case, Detective Mauer went to great lengths to apprise Hart of his rights. He testified that he went over the *Miranda* rights waiver form with Hart and carefully explained each *Miranda* warning to Hart, including that anything he said could be used against him in court. Mauer testified that Hart signed the form to indicate that he understood each right and that he was willing to answer questions without a lawyer. Although a signed *Miranda* waiver form is "usually strong proof" that a suspect voluntarily waived his rights, it is not conclusive on this issue. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably . . . sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case."); *see also Blasingame v. Estelle*, 604 F.2d 893, 896 (5th Cir.1979)[17] ("Defendant's signing of the waiver form, though *not conclusive*, is 'usually strong proof' of the voluntariness of the waiver.") (emphasis added). Our analysis cannot end with Hart's signing of the waiver form because we are required to examine the "totality of the circumstances surrounding the interrogation" to determine whether Hart's decision to waive his rights was made voluntarily, knowingly, and intelligently.[18]

us to examine the totality of the circumstances surrounding the interrogation, we examine the entire interrogation for evidence of involuntariness, and the signed waiver is only one piece of that evidence.

**17.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**18.** The dissent believes that we assume "that Schuster's statement was made while still in the *Miranda* waiver process." We find no support for a distinction between the *Miranda* waiver process and the interrogation process.

Such a distinction fails to consider the totality of the circumstances surrounding the interrogation, and instead only considers the circumstances leading up to and including the signing of the waiver form. Furthermore, under such a distinction, a defendant who has been apprized of his rights and signed a waiver form would not be able to later ask for clarification of his rights and expect an honest response from police; instead, police would be permitted to respond to clarifying questions regarding *Miranda* rights with deception as long as they did so after the waiver form was signed. The signed waiver form does not have talismanic powers; it is merely one piece of evidence to be considered in the totality of the circumstances analysis.

Mauer testified that, after Hart signed the waiver form, Mauer asked him if he knew anything about the homicides at Elite the previous night. When Hart answered that he did not know anything, Mauer informed him that the police had a witness who had identified Hart as being present during the homicides. Hart then asked to speak to Schuster because he trusted her. Schuster testified that when she arrived Hart asked her whether he should get a lawyer, and she told him that she could not answer that. She left the room for a few minutes to give him time to think about it. When she returned, Hart asked her what were the pros and cons, in her opinion, of hiring a lawyer. Although asking for the pros and cons of hiring a lawyer is not an unequivocal request for counsel, it does indicate that Hart did not fully understand his right to counsel and was asking for clarification of that right.

Schuster responded to Hart's request for clarification by telling him that in her opinion the pros of having an attorney were "He'll protect your rights. He'll tell you what to answer, what not to answer, and he'll be here for you." This was an acceptable response, but then she also told him that the con in her opinion was "I'm going to want to ask you questions and he's going to tell you you can't answer me." Hart asked Schuster for a clarification of his right to counsel, and Schuster responded by telling him that the disadvantage of having a lawyer present was that the lawyer would tell Hart not to answer incriminating questions. The reason for requiring a lawyer during custodial interrogation is to protect a suspect's privilege against self incrimination, yet, Schuster in effect told Hart that this was the disadvantage of having a lawyer.

During this colloquy on the pros and cons of hiring a lawyer, Schuster also told Hart that "honesty wouldn't hurt him." Telling him that "honesty wouldn't hurt him" contradicted the *Miranda* warning that anything he said could be used against him in court.[19] The phrase "honesty will not hurt you" is simply not compatible with the phrase "anything you say can be used against you in court." The former suggested to Hart that an incriminating statement would not have detrimental consequences while the latter suggested (correctly) that an incriminating statement would be presented at his trial as evidence of his guilt.

■ Schuster's conduct was not unlike the conduct of the FBI agents in *United States v. Beale*, 921 F.2d 1412 (11th Cir. 1991).[20] In *Beale*, we held that a defendant's *Miranda* waiver was invalid because, "by telling [the defendant] that signing the waiver form would not hurt him the [FBI] agents contradicted the *Miranda* warning that a defendant's statements can be used against the defendant in court, thereby misleading [him] concerning the consequences of relinquishing his right to remain silent." *Beale*, 921 F.2d at 1435. We see no significant difference

---

19. The dissent contends that we have contorted the meaning of the phrase "honesty wouldn't hurt him" by considering the phrase in isolation and out of context. We have not considered this phrase in isolation or out of context. We have considered the phrase along with all of the surrounding circumstances in the context of a suspect asking for a clarification of his rights and a police officer responding with statements that were contrary to the *Miranda* warnings.

20. The dissent criticizes our reliance on *Beale* because Eleventh Circuit precedent cannot announce clearly established federal law, as determined by the Supreme Court. We do not rely on *Beale* for clearly established federal law as determined by the Supreme Court. Instead, we rely on *Beale* as an illustration of clearly established federal law applied to similar facts.

between the facts presented in *Beale* and the facts presented in the instant case.[21] Schuster's statement that honesty would not hurt Hart had the same misleading effect as the FBI agents' statement that signing the waiver form would not hurt the suspect in *Beale*.

Given the totality of the circumstances surrounding the interrogation, which include Hart's trust of Schuster and Schuster's statements contradicting the *Miranda* warnings, we cannot say that Hart's decision to waive his rights and confess was voluntary, knowing, and intelligent. His decision to waive his rights and confess was the product of Schuster's deception and, as a result of her contradictory statements, he did not truly understand the nature of his right against self-incrimination or the consequences that would result from waiving it. Therefore, his waiver was not voluntary, knowing, and intelligent as required by *Miranda,* and the state court's failure to apply the correct legal standard to this issue resulted in a decision that was contrary to clearly established federal law, as determined by the Supreme Court.

## B.

■■ The admission of statements obtained in violation of *Miranda* is subject to harmless error scrutiny. "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963). "This determination requires a two-fold inquiry into (1) the effect of the erroneously admitted statement upon the other evidence introduced at trial, and (2) upon the conduct of the defense." *Beale,* 921 F.2d at 1435 (citing *Harryman v. Estelle,* 616 F.2d 870, 875 (5th Cir.1980) (en banc)).

■ In this case, there is definitely a "reasonable possibility" that Hart's statement contributed to his conviction. At Hart's trial, the prosecution introduced Hart's statement into evidence both through Schuster's testimony and by playing a tape recording of the statement for the jury. The prosecution also presented the testimony of a police expert to contradict the portion of Hart's statement in which he denied shooting the victims. The police expert testified that the physical evidence on the pillow retrieved from the crime scene indicated that all of the shots fired at Todd Klein were fired in rapid succession without removing the muzzle of the rifle from the pillow. This contradicted Hart's statement that he deliberately missed, and Leonard later fired the shots that killed Klein. The only evidence the prosecution presented to link Hart to the murders which was not related to Hart's statement was a fingerprint which was found on the outside of the door to Elite. The fingerprint only established that at some time Hart had touched the outside of the door to Elite; without Hart's statement, it was insufficient to establish his guilt. Aneschka Culmer, the only eyewitness, did not testify. Hart's four co-defendants also did not testify. In short, there

---

**21.** The dissent also criticizes our reliance on *Beale* because *Beale* is easily distinguishable. *Beale* is easily distinguishable for the dissent because of the dissent's distinction between the *Miranda* advice of rights phase and the interrogation phase. Because we disagree with this distinction, we do not believe that *Beale* is distinguishable. The conduct of the FBI agents in *Beale* would have been just as constitutionally reprehensible if they had lied to the suspect regarding the nature of his rights after he signed the waiver form. A suspect's signature on a waiver form does not give police carte blanche to lie to the suspect about his *Miranda* rights if he indicates that he does not understand them and asks for clarification.

is a high probability, much less a "reasonable possibility," that the evidence complained of contributed to Hart's conviction, and the introduction of Hart's statement therefore was not harmless error.

The introduction of Hart's statement likewise had a significant effect on the conduct of the defense. The admission of Hart's statement led his attorney to present a defense based on coercion and duress. He called a neuropsychologist to explain how Hart's background and psychological problems made it easy for Hart to be intimidated and controlled by Leonard. Hart also testified about his relationship with Leonard and explained his version of the events surrounding the murders. The fact that this testimony would have been unnecessary if the prosecution had not been allowed to present the unlawfully obtained statement is further evidence that the admission of the statement was not harmless error.

### III.

For the foregoing reasons, we REVERSE the district court and GRANT Hart's petition for writ of habeas corpus.

SO ORDERED.

VINSON, District Judge, dissenting:

I respectfully dissent. My disagreement with the majority exists on three levels. First, factually, I do not agree with the majority that Schuster's statement to Hart that "honesty wouldn't hurt" constitutes a nullification of Hart's *Miranda* warning and waiver, considering, as we must, the totality of the circumstances. Second, as a matter of law, there is not clearly established law of the Supreme Court of the United States as to whether a post-waiver statement, such as the one at issue in this case, nullifies an earlier, correctly given *Miranda* warning and waiver. Third, the state court's application of the law, regardless of whether it may be considered as "clearly established," was not contrary to, or an unreasonable application of, Supreme Court precedent.

### I. Schuster's Statement Taken Properly in Context

In considering whether Hart's confession was coerced, we must evaluate the totality of the circumstances. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). There is little disagreement about the facts regarding what transpired in this case. The majority concedes that the police went to "great lengths" to apprise Hart of his *Miranda* rights. The officer carefully explained each of the rights to Hart, and Hart indicated both that he knew all about his rights from his prior case, in which Hart was represented by counsel, and that he understood each of the rights before agreeing to answer any questions. After explaining Hart's rights to him, detective Mauer told Hart to initial a place on the *Miranda* waiver form if he wished to talk to the police without an attorney present, which Hart did. The trial court found that Hart was alert, that he had slept six to seven hours the night before, and that he was able to understand what was explained to him. Hart then signed the waiver, witnessed by both Mauer and Sergeant Perez. After being asked about the homicide, Hart initially denied any knowledge (a lie). After being told that a witness had identified him, Hart requested that Schuster be called to the police station. Upon arrival, Schuster was informed by Mauer that Hart had already waived his *Miranda* rights. Hart's signed, written *Miranda* waiver form was on the table. Schuster testified that her purpose for interviewing

Hart was to obtain a statement from him.[1] Schuster told Hart that she was obligated to repeat anything Hart told her, and Hart said "let's get started" after Schuster returned from giving him additional time to think about getting an attorney. The trial court found Hart never asked for his grandmother, or for an attorney, to be present during his interrogation. Finally, after describing all that had taken place, Schuster testified in the suppression hearing that she told Hart that "honesty wouldn't hurt him."[2] Hart then confessed to Schuster. Hart was later re-Mirandized before he made his taped confession.

When considered in context and in light of the total circumstances, I believe it is reasonable to interpret Schuster's statement of "honesty wouldn't hurt" to mean that, knowing Hart had already waived his *Miranda* rights, and already willingly agreed to talk to the police, but had already lied to the police, then whatever he said should be truthful. The majority contorts its meaning from a recommendation not to lie into a trick to get Hart to talk about the homicide. Hart knew that he had been identified by an eye-witness to the crime. He had told Detective Mauer that he knew all of his *Miranda* rights from his prior arrests, but Mauer reviewed his rights again, in detail. Hart had willingly agreed to talk to the police without an attorney present before Schuster even arrived. Hart had already been told that he might face the death penalty if convicted as an adult. The signed *Miranda* waiver form was on the table in front of Hart throughout his entire conversation with Schuster. Hart had already been told that he was in "the biggest trouble possible"; it was evident that any further lies would only compound his "trouble." Hart knew that he could request a lawyer at any time and that anything he told Schuster would be used against him.[3] Hart understood an attorney's role in our criminal justice system because he had been represented by an attorney in his recent credit card theft case.[4] Schuster's statement to the effect that "honesty wouldn't hurt him" did not compel Hart's incriminating statement because Hart had already agreed to talk to the police.[5] Honesty is the cornerstone of

1. Which makes sense because Hart had already signed and waived his *Miranda* rights and agreed to talk to the police.

2. We do not know Schuster's exact words to Hart. The suppression hearing was conducted more than a year after the interrogation, and the portion of the interrogation where Schuster made her statement was not recorded. Hart also testified at length during the suppression hearing. Importantly, it does not appear that he mentioned anything about any "honesty" statement from Schuster. Plainly, he did not indicate that he had been misled or deceived by such a statement from Schuster.

3. Schuster apparently reiterated this right to Hart when she reminded him that anything he said to her would not be kept in confidence.

4. The credit card theft case was still pending when Hart was questioned in relation to this case because the police told Hart the credit card theft case was the subject of the initial interrogation. In his motion to suppress, Hart argued to the trial court that the police should have contacted the attorney that represented him in the credit card theft case before questioning him in the murder case and that the failure to do so violated his Sixth Amendment right to counsel. The trial court rejected this claim, and correctly so.

5. Both the trial court and the district court found that Hart had clearly waived his *Miranda* rights before he spoke to Schuster. Of course, Hart could have ceased the interrogation at any time, even after his waiver, by asserting his right to remain silent or to seek counsel. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Unless that assertion is unequivocal, the police could continue questioning Hart. *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). The state court found Hart's inquiries were not

our system of justice. Witnesses testify under oath because they are required to tell the truth, and dishonesty is not tolerated. In criminal trials, cooperating witnesses testifying for the government are routinely admonished to "tell the truth." It is ironic that the majority finds a statement recommending honesty to be a *Miranda* nullification. Hart was fully advised of his *Miranda* rights; his decision to answer the officers' questions was uncoerced; he knew he could request a lawyer at any time and that any statement he made to Schuster would be used against him.

> Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.

*Moran v. Burbine,* 475 U.S. 412, 422–23, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). The majority apparently believes that Hart took Schuster's statement literally and confessed because he truly believed he would not be prosecuted if he confessed, despite all of the information Hart had previously been given about the implications of confessing. There is no evidentiary support for that conclusion. All of the facts of this case point to a knowing, voluntary, and intelligent waiver of Hart's rights, supporting the rulings of the three prior courts which have reviewed the *Miranda* challenge in this case. Those courts did not feel that it was necessary to even address Schuster's statement to Hart that "honesty wouldn't hurt him" for the simple reason that it was apparently not raised as a distinct issue in the state courts.[6] Because I conclude from the totality of the undisputed evidence in the record that Hart's statement was "uncoerced," that he knew at all times that he could "stand mute and request a lawyer," and that he understood the consequences of his confession, Hart's waiver of his *Miranda* rights was "valid as a matter of law." *Id.* The state court's factual findings are presumed correct unless rebutted with "clear and convincing" evidence. 28 U.S.C. § 2254(e)(1).

Factually, the state trial judge considered all of the evidence presented at the suppression hearing and concluded, after a lengthy analysis, "that Hart's statements were freely, voluntarily, and intelligently made." The majority's conclusion that the state courts had not "analyzed whether Hart's colloquy with Schuster resulted in a waiver that was not voluntary, knowing, and intelligent" is obviously at odds with the record.

## II. *Clearly Established Federal Law*

I also disagree with the majority that Supreme Court precedent is "clearly established" on this issue. Title 28, United States Code, Section 2254(d)(1) requires that, in order for a federal court to grant a

---

unequivocal, and Hart does not challenge that finding on appeal.

**6.** In a very thorough order (totaling nineteen pages for all defendants), the trial judge ruled on the three *Miranda* issues raised by the defendant in the suppression hearing: (1) "whether the deceptive means of bringing the defendant in for questioning should nullify compliance with the standards for free and voluntary confessions mandated by *Miranda*

....."; (2) "what duty do the police owe a juvenile to have a parent present for questioning?"; and (3) "was there a clear and unequivocal request for counsel?" After deciding against Hart on all three of these issues, the trial judge concluded: "This Court finds that Hart's statements were freely, voluntarily, and intelligently made and his motion to suppress these statements is denied."

writ of *habeas corpus*, the state court's decision must be contrary to or be an unreasonable application of "clearly established Federal law, *as determined by the Supreme Court of the United States*." (emphasis added). Clearly established federal law for the purposes of Section 2254 is not the law of lower federal courts, including this court.[7] *Hall v. Head*, 310 F.3d 683, 691 (11th Cir.2002).

Only the holdings of the Supreme Court constitute clearly established federal law for the purposes of Section 2254. *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The *Miranda* warning requirement and its contents are certainly clearly established. *Dickerson v. United States*, 530 U.S. 428, 438, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); *Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966). That a valid *Miranda* waiver must be made knowingly, voluntarily, and intelligently is also clearly established.[8] *Moran v. Burbine, supra*, 475 U.S. at 421, 106 S.Ct. at 1141, 89 L.Ed.2d at 421.

What post-waiver statements amount to retroactive nullification of a prior valid *Miranda* waiver, if that is even possible, has *not* been clearly established by the Supreme Court. In fact, a suspect's uncoerced, fully informed decision not to assert his *Miranda* rights is a valid waiver as a matter of law, even when followed by some coercion in the interrogation process. *Moran v. Burbine, supra*, 475 U.S. at 422–23, 106 S.Ct. at 1141, 89 L.Ed.2d at 422. "[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process." *Id.* at 427, 106 S.Ct. at 1144,, *quoted in Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). "A suspect who knowingly and voluntarily waives his right to counsel after having the right explained to him has indicated his willingness to deal with the police unassisted." *Davis, supra*, 512 U.S. at 460–61, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). "[A] careful and thorough administration of Miranda warnings [even] serves to cure the condition that rendered [a prior] unwarned statement inadmissible," allowing a subse-

**7.** I also disagree with the majority when it fails to see any "significant difference between the facts presented in *Beale* and the facts presented in the instant case." *Majority Opinion, supra*, at 894. *Beale* involved the authorities inducing a barely literate Spanish-speaking suspect to sign a *Miranda* waiver by telling him that signing the waiver would not hurt him. *Beale* is thus a case of fraud in the inducement to sign a waiver, where the suspect was misled as to the waiver's effect. Further, the only relevant Supreme Court case cited by *Beale*, other than *Miranda* itself, is *California v. Prysock*, 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981), for the general proposition that *Miranda* warnings should not be misleading. *See United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir.1991). Thus, *Beale* does not illustrate how clearly Supreme Court precedent is established. In this case, unlike *Beale*, there is no dispute that Hart was alert, intelligent, and fully informed

of his rights *prior to both* the execution of the *Miranda* waiver *and* the making of his incriminating statement. The police painstakingly informed Hart of his rights prior to questioning him, and he clearly acknowledged that he understood his rights. There can be no doubt from the record that Hart understood his *Miranda* rights and that he freely, knowingly, and intelligently waived his *Miranda* rights.

**8.** The majority's contention that it can "derive clearly established law from these general principles rather than waiting for bright line rules," *Majority Opinion, supra*, at n. 16, undermines the clearly established law requirement and masks the *de novo* review the majority really is applying to this case. It also further undermines the "materially indistinguishable facts" aspect of the "contrary to" clause analysis, which also contemplates application to multi-variant factor analyses.

quent post-warning confession to be admissible. *Oregon v. Elstad,* 470 U.S. 298, 310, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

Even if one assumes, as the majority seems to do,[9] that Schuster's statement was made while still in the *Miranda* waiver process, there is no "clearly established" Supreme Court decision that indicates such a statement constitutes nullification.[10] *See, e.g., Duckworth v. Eagan,* 492 U.S. 195, 205, 109 S.Ct. 2875, 2881, 106 L.Ed.2d 166, 178 (1989)(holding that telling suspect he would be provided a lawyer *if and when* he went to court did not contravene *Miranda*); *Moran v. Burbine, supra,* 475 U.S. at 424, 106 S.Ct. at 1142, 89 L.Ed.2d at 422 (deliberate or reckless withholding of information from suspect in custodial interrogation is only relevant to constitutional validity of *Miranda* waiver if it deprives the suspect of knowledge "essential to his ability to understand the nature of his rights and the consequences of abandoning them."). Failure to administer the *Miranda* warnings *at all* only raises a presumption of involuntariness. *Elstad, supra,* 470 U.S. at 310, 105 S.Ct. 1285, 84 L.Ed.2d 222; *Miranda, supra,* 384 U.S. at 457, 86 S.Ct. 1602, 16 L.Ed.2d 694. The majority cites no Supreme Court case where post-warning misrepresentations by police nullified a *Miranda* waiver. In fact, the Supreme Court has specifically declined to consider whether an affirmative misrepresentation by law enforcement would invalidate an otherwise valid waiver: "In this case, we are not confronted with an affirmative misrepresentation by law enforcement officials as to the scope of the interrogation

and do not reach the question whether a waiver of Miranda rights would be valid in such a circumstance."[11] *Colorado v. Spring,* 479 U.S. 564, 576 n. 8, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987)(holding police officer's failure to inform suspect of all possible subjects of interrogation was not relevant to determining whether waiver was voluntary, knowing, and intelligent). Because Supreme Court precedent is not clearly established on the issue of whether or what post-waiver representations can nullify a prior valid *Miranda* waiver, granting the writ is prohibited by Section 2254(d).

### III. *The State Court's Decision was not Contrary to Supreme Court Precedent*

I further disagree with the majority's conclusion that the trial court's decision was "contrary to" clearly established Supreme Court precedent. The Supreme Court of the United States has explained the framework of Section 2254 review in *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly estab-

---

**9.** Contrary to the findings of both the state court and the district court.

**10.** Assuming Hart had not yet waived his rights, I interpret Schuster's statement as reasonably meaning that, *if* Hart was going to talk to the police, he should tell the truth.

**11.** Hart raised this exact issue to the trial court by arguing that the police tricked him into coming to the police station for questioning about his credit card theft case. The trial court properly relied upon Florida case law to resolve this issue against Hart.

lished Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. 529 U.S. at 412–13, 120 S.Ct. at 1523, 146 L.Ed.2d at 430 (O'Connor, J., concurring, and writing for the majority of the Court as to Part II of the opinion which deals with this issue.)

Under the "contrary to" clause of Section 2254(d)(1), therefore, a writ of *habeas corpus* may only be granted where the state court decision either "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or the state court "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent."[12] *Williams, supra,* 529 U.S. at 405–06, 120 S.Ct. 1495,

146 L.Ed.2d 389. The "contrary to" clause in Section 2254(d)(1) "suggests that the state court's decision must be substantially different ...'opposite in character or nature' [or] 'mutually opposed' " to clearly established Supreme·Court precedent. *Id.* at 405, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (citing the definition of "contrary" in WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 495 (1976)).

As long as the state court applies the "correct legal rule," the federal courts cannot substitute their own judgment to reach a different result under the "contrary to" clause, as we have held:

> Although a state court's decision that "applies a rule that contradicts" the governing Supreme Court precedent is "contrary," a state court decision that applies "the correct legal rule" based on Supreme Court law to the facts of the petitioner's case would not fit within the "contrary to" clause even if the federal court might have reached a different result relying on the same law.

*Fugate v. Head,* 261 F.3d 1206, 1216 (11th Cir.2001)(internal citations omitted); *see also Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 1852, 152 L.Ed.2d 914, 929 (2002) (because state court identified correct legal rule "we find no merit in respondent's contention that the state court's adjudication was contrary to our clearly established law.")

The record reflects that the state court did identify and apply the correct governing legal rules.[13] Where the Supreme

---

**12.** Justice O'Connor provided an example of a decision that would be "contrary to" Supreme Court precedent. Where a state court required a different evidentiary burden to establish an ineffective assistance of counsel claim than that expressly identified in governing Supreme Court case law, the state court would apply a rule contradictory to governing

law. *Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389.

**13.** The issues presented to us were also thoroughly briefed to the Florida Third District Court of Appeal, which affirmed the judgment of the district court without opinion. The trial court's reliance upon the Supreme Court's decision in *Davis v. United States,* 512

Court has articulated a multi-factor balancing test or all-encompassing "totality of the circumstances" test and the state court applies that test, it is especially difficult for a federal court to conclude that a state court's decision was contrary to Supreme Court precedent. When applying such a test, I agree with our colleagues in the First Circuit that reversing the state court under the "contrary to" clause must be only in a case where the legal application *requires* a particular result. *See Kibbe v. DuBois*, 269 F.3d 26, 35 (1st Cir.2001)(quoting *O'Brien v. Dubois*, 145 F.3d 16, 24 (1st Cir.1998)). Where the Supreme Court has distilled constitutional principles into a "channeled mode of analysis specifically intended for application to variant factual situations," a state court's decision that is not based on facts materially indistinguishable can only be "contrary to" clearly established federal law where the application of the articulated framework "can fairly be said to *require* a particular result in a particular case." *Id.* Only if the application of the totality of the

circumstances test necessarily *required* a determination that Hart's confession was involuntary would I find that the state court's decision, which was not based on materially indistinguishable facts, is "contrary to" Supreme Court precedent. This is not such a case.

The majority concludes that the decisions of the state courts were contrary to Supreme Court precedent because "Neither court ... analyzed whether Hart's colloquy with Schuster resulted in a waiver that was not voluntary, knowing, and intelligent."[14] But the trial judge, who heard all of the evidence, including Schuster's testimony, specifically concluded, "This Court finds that Hart's statements were freely, voluntarily and intelligently made and his motion to suppress these statements is denied." I fail to understand how the majority apparently believes that the trial court did not analyze and consider the totality of the circumstances in making this determination.[15] The record plainly reflects that the trial court did, in fact, con-

---

U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), was most appropriate. *Davis* is the governing Supreme Court precedent on ambiguous invocations of the right to counsel. Having determined that Hart made his statement to the police freely, voluntarily, and intelligently, the only alternative basis for suppression presented to the trial court was that Hart had, in his discussion with the police, invoked his right to counsel. On its facts, *Davis*, is actually similar to this case, except that, as the trial court correctly concluded, Hart did not unequivocally invoke his right to counsel. *See id.* at 455, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (suspect advised of rights, waived rights orally and in writing, later made equivocal statements about getting a lawyer, and eventually clearly invoked right to counsel).

14. The exact issue presented to the trial court was not focused on just three words ("honesty wouldn't hurt") in the lengthy interview described in the record, but rather on the totality of the circumstances. Hart argued gen-

erally that his confession was involuntarily obtained because it was obtained through police threats and direct or implied promises of leniency or benefits. Hart did not testify or argue that Schuster's statement to Hart that "honesty wouldn't hurt him" coerced his confession.

15. The majority seems to mean that the trial court did not consider what the majority, on *de novo* review, now concludes is the *most important* of the totality of the circumstances, Schuster's isolated statement. The majority's *de novo* approach to the review of the voluntariness of Hart's confession typifies the pre–1996 approach to habeas corpus review of such confessions. *Compare Miller v. Fenton*, 474 U.S. 104, 110–11, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). After the Anti–Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. 104–132, § 104, federal courts are required to apply a more deferential standard for habeas review of state court decisions.

sider the "totality of the circumstances." Addressing Hart's claim that his grandmother should have been present during the interrogation, the trial court stated, "This court finds that *the totality of the circumstances* indicate that Hart had no desire to see his grandmother and *his decision to waive his rights* was not contingent upon his meeting with her." As support for this statement, the trial court cited *Doerr v. State,* 383 So.2d 905, 907 (Fla.1980), wherein the Supreme Court of Florida agreed with a lower court's statement that:

> The United States Supreme Court has held that the admissibility of a juvenile confession depends on the "totality of the circumstances" under which it was made. *Gallegos v. Colorado,* 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962). The more immature the juvenile may be, the greater the likelihood exists that his confession will be deemed inadmissible. The fact that a juvenile's confession was given before he had the opportunity to talk with his parents or an attorney is certainly a factor militating against its admissibility. But, the existence of this fact does not preclude a finding of voluntariness depending upon all of the other circumstances surrounding the confession.

*Doerr v. State, supra,* 383 So.2d at 905–907 (quoting with approval *Doerr v. State,* 348 So.2d 938 (Fla. 2d DCA 1977)).

The trial court also cited *State v. Paille,* 601 So.2d 1321, 1324 (Fla. 2d DCA 1992), which noted: "The test of admissibility of a juvenile confession is the *totality of the circumstances* under which it was taken."

(emphasis added). It is clear that the trial court identified the correct governing legal rule—that the admissibility of a confession ("voluntary, knowing, and intelligent") is to be evaluated based on the totality of the circumstances.

Further, the trial court made a number of findings in evaluating the circumstances surrounding Hart's confession.[16] The trial court found that Hart was calm, alert, intelligent, knowledgeable about the criminal justice system, capable of understanding his rights, and that he had six to seven hours of sleep the night before the interrogation. Contrary to the majority's assumption, Hart understood (and told Mauer that he understood) his right to an attorney because he was represented by counsel in his recent credit card theft case. There is no evidence that the interrogation was excessively long. The police even ordered pizza for him to eat. "Any statement [by the suspect] given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Illinois v. Perkins,* 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990)(quoting *Miranda, supra,* 384 U.S. at 478, 86 S.Ct. 1602, 16 L.Ed.2d 694).

According to the majority's version of the totality of the circumstances, Schuster's statement to Hart that "honesty wouldn't hurt him" and her opinion as to the pros and cons of getting a lawyer compelled Hart to involuntarily confess and made his waiver a product of her deception.[17] *Miranda's* prophylactic purpose is to guard against coerced confessions obtained in violation of the Fifth

---

**16.** *See Fare v. Michael C,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)(factors for evaluating juvenile confession include the suspect's age, experience, education, background, intelligence, capacity to understand the *Miranda* warnings, the nature of his Fifth

Amendment rights, and the consequences of waiving those rights).

**17.** Of course, Schuster could not have coerced Hart to sign the *Miranda* waiver form because she was not yet present when Hart signed the form.

Amendment. Subtle coercion inherent in the interrogation process is remedied by prior advisement and understanding of *Miranda* rights, which give the suspect the power to halt the interrogation. As noted earlier, the Supreme Court has held that a knowledgeable *Miranda* waiver is not nullified by such coercive interrogation: "[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process." *Moran v. Burbine, supra,* 475 U.S. at 427, 106 S.Ct. 1135, 89 L.Ed.2d 410. "Once warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities." *Oregon v. Elstad,* 470 U.S. 298, 308, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

Schuster's conversation with Hart was not the type of coercive police activity that "threatened, tricked or cajoled" him into confessing. *Miranda, supra,* 384 U.S. at 476, 86 S.Ct. 1602, 16 L.Ed.2d 694. Schuster told Hart she could not make the decision whether to seek a lawyer for him. When Hart asked about the pros and cons, Schuster gave Hart her opinion, but Hart's inquiries do not mean that he failed to understand his right to counsel. He certainly understood that right because he had an attorney in another case. Nor does it mean that he was uncertain about whether his statements could be used against him. Instead, it is apparent that Hart was simply trying to figure out the best way to minimize the "big trouble" he was in. Schuster's discussion with Hart and her statement to Hart that "honesty wouldn't hurt him" was certainly not, in light of the totality of the circumstances, coercive to the point that it compelled Hart to confess against his will. The state court's decision was not "contrary to" any Supreme Court precedent, and granting of the writ is improper.

IV. *The State Court's Decision was not Unreasonably Erroneous*

Finally, I also want to address why the state court's decision was not unreasonable. *See* 28 U.S.C. § 2254(d)(1); *Williams, supra,* 529 U.S. at 411, 120 S.Ct. at 1522, 146 L.Ed.2d at 429 ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant statecourt decision applied clearly established federal law erroneously or incorrectly. Rather, *that application must also be unreasonable.*")(emphasis added). This court may not grant a writ of *habeas corpus* simply because it would have decided the case differently. *Woodford v. Visciotti,* —— U.S. ——, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002)(*per curiam*)(reversing Ninth Circuit for substituting its own judgment for that of state court). The 1996 amendments to Section 2254 create a heightened standard on collateral review, increasing the deference to state court resolutions of arguable constitutional questions. The appropriate analysis is to first determine whether the state court's decision was incorrect and, if so, then to determine whether the state court's error was objectively unreasonable.[18] *Id.; Penry v. Johnson,* 532 U.S. 782, 793, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001); *Brown v. Head,* 272 F.3d 1308, 1313 (11th Cir.2001)("It is ob-

---

**18.** The former is an analysis of the law: whether the decision was erroneous as a matter of law. The latter externally considers the *concreteness* with which the law has developed as a guide to state court decision-making: whether the decision was so erroneous as to be objectively unreasonable under the facts of the case. Bifurcating the analysis allows principles of constitutional law to continue to be clarified through the habeas system by purely evaluating the correctness of the state court's decision, akin to harmless error review.

jective reasonableness, not correctness *per se*, of the state court decision that we are to decide."); *Boss v. Pierce*, 263 F.3d 734, 739 (7th Cir.2001)(state court decision's application of Supreme Court precedent must be *"so erroneous as to be unreasonable."*)(emphasis added). Justice O'Connor's portion of the plurality opinion in *Williams v. Taylor* explained that a state court's decision would be unreasonably erroneous where the decision correctly identified the governing clearly established legal rule, but unreasonably applied that rule to the facts of the case.[19] *See Williams, supra*, 529 U.S. at 407–08, 120 S.Ct. at 1520–21, 146 L.Ed.2d at 427.

In seeking to suppress his confession, Hart testified in the suppression hearing and argued to the state court that his confession was not freely and voluntarily given because it was obtained through police threats and direct or implied promises of leniency or benefits. The trial court concluded Hart's statements were freely, voluntarily, and intelligently given. As discussed earlier, this was predominantly a factual conclusion, within the *Miranda* legal framework as properly identified by the trial judge. For the same reasons that I conclude the state court's decision was not "contrary to" clearly established Supreme Court precedent, I also conclude the state court's denial of suppression was neither an "unreasonable application" of the law nor an "unreasonable determination" of the facts. The state court identified the governing legal rule, considered the totality of the factual circumstances, and correctly applied that rule to the facts of this case. We are prohibited by Section 2254(d)(1) from second-guessing the state court as to the factual application of a legal issue which is far from clearly established. "[I]f it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application." *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir.2002). I believe that consistent application of the unreasonable application standard leads to the inescapable conclusion that there can be no "unreasonable application" of the law in this case. The trial court's decision was also not an "unreasonable determination" of the facts in light of the evidence presented.

Because neither the majority nor I can identify clearly established Supreme Court precedent which would mandate nullification of Hart's *Miranda* warning and waiver, we are left without an external basis, other than our own subjective opinion, for evaluating the state court's decision. Taking Schuster's statement properly in factual context, I conclude that the trial court correctly evaluated the facts before it, but even if it did not, the trial court's decision definitely was not an objectively "unreasonable" determination of the facts. Nor was the trial court's ruling "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." I believe that we are required by Section 2254(d)(1) to affirm the district court's decision.

---

**19.** In *Williams*, Justice O'Connor also noted that extending a legal principle to a new context, or a failure to do so, may present "problems of precision" under the "unreasonable application" clause. The Supreme Court declined to decide how that type of case should be treated under Section 2254(d)(1). *Williams, supra*, 529 U.S. at 408, 120 S.Ct. at 1521, 146 L.Ed.2d at 427.