[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-14434
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 20, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-00144-CR-2-WKW-SRW

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PAUL MEREZ GRAHAM,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(April 20, 2009)

Before WILSON, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Paul Merez Graham appeals from the district court's denial of his motion to suppress evidence found during a search of his vehicle and incriminating post-arrest statements made at the police station. First, he argues that police officers violated his Fourth Amendment rights by approaching and surrounding his parked vehicle without reasonable suspicion. Second, he argues that his incriminating statements were involuntary because the questioning officer informed Graham that cooperating would benefit him. For the reasons set forth below, we affirm.

## I.

A federal grand jury returned a second superseding indictment against Graham, charging him with possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1) (Counts One and Four), use of a firearm during a drug-trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Counts Two and Five), and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Counts Three and Six).

Graham filed a motion to suppress, arguing first that the court should suppress a firearm and controlled substances discovered during a warrantless search of his vehicle. Specifically, he submitted, inter alia, that the search violated his Fourth Amendment rights because the law enforcement officers lacked

reasonable suspicion to initially "surround" and "detain" Graham in the vehicle. Second, Graham argued that the court should suppress incriminating statements because the officers did not advise him of his Miranda[1] rights, in violation of the Fifth Amendment. Graham also argued that his statements were involuntary because the officers told him that "he could work off or down charges in exchange for his providing information and assistance."

A magistrate judge held a hearing on the suppression motion, and the government called Detective Tommy Conway, an investigator for the Montgomery Police Department ("MPD"), who testified as follows. On January 10, 2006, at approximately 4 p.m, Conway received an anonymous tip that a man named Paul Graham would be going to a particular Pizza Hut to deliver cocaine to "some guys in an older model Cadillac." The tipster told Conway that Graham would be en route shortly and would be driving a small, red car. Conway assembled a team of five or six officers, who went to the Pizza Hut. Except for one SWAT vehicle that was in the area, all of the officers drove unmarked vehicles, including Conway, who was accompanied by a Captain Hughes.

While Conway was at the Pizza Hut waiting for the cars to arrive, he received another call from the tipster, who told him that Graham was on his way

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

and would be showing up in a few minutes. Five to ten minutes later, a small, red car with two people inside pulled into the Pizza Hut parking lot, slowly circled around the parking lot, and then parked in the back of the lot. While the officers continued to wait for the Cadillac to show up, Conway observed the red car pull out of the space, slowly drive around the parking lot, and return to the same parking spot. Because this behavior suggested that the car was casing the Pizza Hut for a robbery, Conway decided to pull up next to the red car to "see what they're up to."

Conway testified that he pulled his vehicle up next to the red car in a manner that would "block [him] from jumping and running because [he] couldn't open the door." He explained that, "just like . . . a regular parking place, if . . . the person beside you has the door all the way open, you can't open your door. So we parked right beside him." Immediately after Conway pulled up next to the red car and Captain Hughes opened his door, Hughes alerted Conway that he saw a gun inside the red car. At that time, Conway and Hughes removed the driver, later identified as Graham, the passenger, and the weapon from the vehicle. When asked where the other officers were at this time, Conway stated that two units responded, parking behind and to the side of Graham's car.

Conway testified that they ultimately found drugs in the car and took

4

Graham back to the police station. At the station, and with a Sergeant Mercado as a witness, Conway read Graham his <u>Miranda</u> rights. Conway then testified as follows:

GOVERNMENT: And after you read Mr. Graham's rights – well while you were reading them, was he talking? What was he doing?

CONWAY: He was talking the whole time to us. He was cooperating with us. He was telling us that the guy in the car was a friend of his he just picked up. That everything in the car was his. And I told him to just hold on. After we got to the office, after reading his rights [h]e told me where the marijuana and cocaine . . . came from, and that he wanted to cooperate and assist us in making a case against that person.

GOVERNMENT: When you read Mr. Graham his rights, was he listening to you?

CONWAY: Yes, sir.

GOVERNMENT: Did you believe that he understood his rights after you read it to him?

CONWAY: Yes, sir.

GOVERNMENT: And that he then proceeded to waive his rights to remain silent voluntarily?

CONWAY: Right.

GOVERNMENT: You said that he told you he wanted to cooperate?

CONWAY: Yes.

. . .

GOVERNMENT: Did you make any promises to him at that time about what kind of prosecution he would be facing, or what you would do for him?

CONWAY: We didn't make any promises. We were suppose[d] to meet back up with him the next day, and I gave him my cell phone number and he was released.

GOVERNMENT: And so just to be clear, he was the one who told you he wanted to cooperate?

CONWAY: Right.

Conway testified that Graham subsequently called Conway later that day and informed him that he no longer wished to cooperate. Several months later, Graham was indicted and arrested.

On cross-examination, Conway reiterated that Graham "wanted to talk." The following colloquy then took place:

DEFENSE COUNSEL: All right. And you talked with him about cooperating, correct?

CONWAY: Correct.

DEFENSE COUNSEL: Would it be correct that the goal of his cooperating would be that he could work off or work down a charge, is that correct?

CONWAY: I don't think we actually discussed anything as to what he would receive

6

|  |  |
|---|---|
|  | or anything like that. We just at that point, he just wanted to cooperate. He wanted to do something to help [himself] out. |
|  | . . . |
| DEFENSE COUNSEL: | But is it fair to say that the understanding was that if he cooperated and if he provided information it certainly wouldn't hurt him, would it? |
| CONWAY: | That's correct. |
| DEFENSE COUNSEL: | It might even help him, correct? |
| CONWAY: | That's correct. |
| DEFENSE COUNSEL: | That was clear, was it not? Although the end result was not exactly clear, correct? |
| CONWAY: | It was clear that [if] he cooperated, that his assistance would benefit him. |
|  | . . . |
|  | I mean, he wanted to know what would happen if he cooperated, and I was like, you know, I told him that if he cooperated whatever he did would benefit him. |

On re-direct examination, Conway reiterated that he did not promise Graham a deal in exchange for cooperating or waiving his Miranda rights.

The government called Captain Robert Hughes of the MPD, who generally

7

testified consistently with Conway. With respect to the incident at the Pizza Hut, Hughes confirmed that they pulled up next to the driver's side of the red car so that when Hughes opened his door, the driver of the red car would be prevented from opening his door and fleeing. Conway and Hughes were dressed in street clothes and were driving an unmarked Lincoln Navigator, which sat up higher than the car, thus allowing Hughes to see the gun inside the red car. When Hughes saw the gun, he drew his weapon, shut his door, identified himself as a law enforcement officer, opened the driver's side door of the red car, and removed Graham from the vehicle.

The defense called Graham, who testified on his behalf as follows. While he was in the parking lot of the Pizza Hut, two cars entered the parking lot, and one car pulled behind him and the other car parked in the space next to him. As soon as the cars pulled up, an officer immediately jumped out of the car, drew his firearm, and pulled Graham out of the car. Graham testified that, at the police station, Conway told him that "there was a mishap and that they [were] looking for somebody else and I just got caught up in the middle of it. And that if I wanted to help myself I could cooperate and tell them where I got these things from and he would make it go away." Graham spoke to Conway because Conway told him that he "was going to go down for somebody else and it would be a good idea for [him] to help [him]self."

8

The magistrate issued a report, recommending that the court deny Graham's suppression motion. With respect to the search of the vehicle, the magistrate found that, even absent reasonable suspicion, "the officers were clearly entitled to approach the defendant and speak to him." The magistrate ultimately concluded that the officers' search of the vehicle was justified under the plain view doctrine and as a search incident to arrest.

With respect to Graham's contention that Conway promised him leniency in order to persuade him to make a statement, the magistrate found that "Graham's relinquishment of his right against self-incrimination was the product of a free and deliberate choice rather than intimidation, coercion, or deception." In a footnote, the magistrate elaborated:

> Defendant does not argue – and the court declines to find – that this case is comparable to those in which officers told defendants that honesty would not hurt them, in contradiction to the Miranda warning that anything they said could be used against them in court. See Hart v. Attorney General of State of Florida, 323 F.3d 884, 894 (11th Cir. 2003); United States v. Beale, 921 F.2d 1412 (11th Cir.1991). In this case, the court is persuaded that Graham did not construe the suggestion that if he cooperated and provided information, it certainly would not hurt him, and might even help him, as an assurance that he would not be prosecuted if he confessed, or that his statements would not be used against him. Instead, considering the totality of the circumstances, the court finds that the gist of what Conway communicated to Graham was simply that he could benefit by cooperating. See . . . United States v. Davidson, 768 F.2d 1266, 1271 (11th Cir. 1985).

9

Thus, the magistrate concluded that this was "not one of those rare cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of Miranda."

Overruling Graham's objection, the district court adopted the magistrate's report and denied Graham's suppression motion. Pursuant to a written plea agreement, Graham then pled guilty to Counts One, Three, Four, Five, and Six of the indictment and reserved the right to appeal the denial of his suppression motion. The court ultimately sentenced Graham to a total of 140 months' imprisonment, and this appeal followed.

## II.

> We review the district court's denial of a motion to suppress evidence as a mixed question of law and fact. The district court's findings of fact are viewed under the clearly erroneous standard; its application of the law to those facts is subject to de novo review. We also construe all facts in the light most favorable to the prevailing party in the district court – here, the government.

United States v. Steed, 548 F.3d 961, 966 (11th Cir. 2008) (quotation omitted).

## A.   **Motion to Suppress Evidence**

"The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures." United States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003). "There are three broad categories of

10

police-citizen encounters for purposes of our Fourth Amendment analysis: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." United States v. Perez, 443 F.3d 772, 777 (11th Cir. 2006).

It is important to emphasize at the outset that Graham challenges only the legality of the officers' initial approach of the parked vehicle; significantly, he does not challenge anything that happened after Captain Hughes saw the firearm in Graham's car. Thus, the issue on appeal is confined to whether the officers violated Graham's Fourth Amendment rights by approaching the parked car in the manner that they did.

In this respect, the district court found that the officers' initial approach of Graham's vehicle involved the first type of police-citizen encounter and, therefore, did not implicate the Fourth Amendment. See Perez, 443 F.3d at 777 ("[T]he first category of consensual encounters does not implicate Fourth Amendment scrutiny.") (quotation and alterations omitted). The district court was correct, as the Supreme Court has held "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." United States v. Drayton, 536 U.S. 194, 200, 122 S.Ct.

11

2105, 2110, 153 L.Ed.2d 242 (2002). Thus, "[o]fficers are free, <u>without any level of suspicion</u>, to approach citizens on the street or in a public place . . . ." <u>Miller v. Harget</u>, 458 F.3d 1251, 1257 (11th Cir. 2006) (emphasis added). Therefore, the mere act of approaching Graham in his parked car was permissible, regardless of whether the officers had reasonable suspicion of criminal activity. <u>See</u> <u>United States v. Baker</u>, 290 F.3d 1276, 1279 (11th Cir. 2002) (so holding, where the officers approached a defendant who was momentarily stopped in vehicular traffic).

Graham counters that reasonable suspicion <u>was</u> required because, by surrounding him with their vehicles, the officers effectively seized him during their initial approach. In determining whether someone has been "seized" for purposes of the Fourth Amendment, the question is whether "a reasonable person would feel free to terminate the encounter." <u>Drayton</u>, 536 U.S. at 201, 122 S.Ct. at 2110. "This test is objective and presupposes an <u>innocent</u> person." <u>United States v. Ramirez</u>, 476 F.3d 1231, 1238 (11th Cir. 2007) (quotation omitted); <u>see</u> <u>Florida v. Bostick</u>, 501 U.S. 429, 438, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 2382 (1991) ("[T]he 'reasonable person' test presupposes an <u>innocent</u> person.").

> Factors relevant to this inquiry include, among other things: whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers

12

present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.

Perez, 443 F.3d at 778 (quotation omitted).

Graham's seizure argument is without merit because, before Captain Hughes saw the weapon in Graham's car, the officers did not display any sign of authority. See Baker, 290 F.3d 1278 ("In order for there to be a sufficient restraint on liberty to elevate an interaction between law enforcement and an individual to constitutional dimensions that trigger Fourth Amendment protection, the police must exert a show of authority . . . ."). Conway and Hughes merely parked their vehicle in an adjacent parking spot. Significantly, there was nothing to suggest at that time that Conway and Hughes were law enforcement officers, as they were in an unmarked Lincoln Navigator, were wearing street clothes, and did not communicate with Graham in any way. Thus, from the perspective of a reasonable, innocent person, Conway and Hughes were simply Pizza Hut customers parking their car.

Graham emphasizes that Conway and Hughes testified that they deliberately parked their car in a manner that would have prevented Graham from opening his car door. However, "it is irrelevant whether [Conway and Hughes] intended to detain" Graham when they parked next to him. Miller, 458 F.3d at 1258 n.4. Instead, what matters is that no reasonable, innocent person in Graham's position

13

would have had any reason to believe that the individuals parking next to him were law enforcement officers.

Graham also points out that a second, unmarked car pulled up behind his vehicle, implying that he was not free to drive away. However, Officer Conway appeared to testify that the second car did not pull up behind Graham's car until after Hughes engaged Graham. Although Graham gave conflicting testimony, we are required to construe the facts in the light most favorable to the government. Steed, 548 F.3d at 966. In any event, even taking Graham's testimony as true, there was still nothing to indicate to a reasonable, innocent person that this second car was a police unit; nor was there any testimony that the two unmarked cars boxed Graham in his parking space.

In sum, under the facts of this case, the Fourth Amendment was not implicated when the officers initially approached Graham by parking in the adjacent parking space.[2]

### B.    Motion to Suppress Statements

"Before the government may introduce a suspect's uncounselled statement made during custodial interrogation, it must show that the suspect made a voluntary, knowing and intelligent waiver of his privilege against

_____

[2] We therefore decline to address Graham's contention that the officers lacked reasonable suspicion to approach the parked vehicle.

self-incrimination and his right to counsel." Beale, 921 F.2d at 1434. In order to do so, the government must first show that "the relinquishment of the right . . . was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). "The district court's ultimate conclusion on the voluntariness of a confession, or the waiver of Miranda rights, raises questions of law to be reviewed de novo. We base our determination on the totality of the circumstances . . . ." United States v. Barbour, 70 F.3d 580, 584 (11th Cir. 1995) (quotations and citations omitted).

On appeal, Graham does not dispute that he was read his Miranda rights at the police station, but rather argues that his subsequent statements were involuntary because they were the product of Officer Conway's deceptive comments.[3] Construing the facts in the light most favorable to the government, Conway, at most, informed Graham that cooperating would benefit him. Significantly, however, it was Graham who initially came forward and offered to

---

[3] We decline to address Graham's argument that the court erred by failing to exclude statements he made at the scene because he raises this argument for the first time in his reply brief. See United States v. Magluta, 418 F.3d 1166, 1185-86 (11th Cir. 2005).

cooperate without any inducement from Conway. See United States v. Mercer, 541 F.3d 1070, 1075-76 (11th Cir. 2008) (concluding that the defendant's statements would be voluntary "[e]ven if the . . . agent approached [the] Defendant about the possibility of a cooperation agreement"). Equally significant is the related fact that Conway testified that he did not make Graham any promises in exchange for his cooperation.[4] See id. at 1075 ("Nothing in the record evidences that anyone made promises to Defendant, direct or implied, in exchange for his statements."); Davidson, 768 F.2d at 1266 ("A statement made by a law enforcement agent to an accused that the accused's cooperation would be passed on to judicial authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary."). Instead, the record reveals that Conway merely confirmed what Graham already understood, namely, that he might be able to benefit in the future if he cooperated.

Graham relies on our decisions in Hart and Beale. In Hart, after the suspect signed a waiver form, officers asked him what he knew about a homicide. 323 F.3d at 894. In response, the suspect asked a police officer who he trusted whether he should hire a lawyer. Id. The trusted officer then explained the pros and cons

---

[4] Construed in the light most favorable to the government, the fact that Conway released Graham from custody after the interview does not establish that Conway made any promises to Graham.

of hiring an attorney, during which point she also told him that "honesty wouldn't hurt him." Id. We concluded that this statement by the officer contradicted the Miranda warning that anything the suspect said could be used against him in court, thus rendering his subsequent statements the "product of . . . deception." Id. at 894-95. In so holding, we emphasized that we had interpreted the officer's comment in light of the totality of the circumstances, especially the fact that the suspect had asked for a clarification of his rights, which indicated that he did not truly understand the nature of his right against self-incrimination or the consequences of waiving that right. See id. at 894-95 & nn.19, 21.

In Hart, we also relied in part upon our previous decision in Beale, where we similarly held that a suspect's Miranda waiver was invalid because FBI agents told him that "signing the waiver form would not hurt him . . . ." Beale, 921 F.2d at 1435; see Hart, 323 F.3d at 894-95 ("We see no significant difference between the facts presented in Beale and the facts presented in the instant case."). Notably, we emphasized that, according to the suspect's unrebutted testimony, "he signed the waiver only after the agent told him that signing the form would not hurt him . . . ." Beale, 921 F.2d at 1435.

This case is distinguishable from Hart and Beale because Graham's incriminating statements were not the product of any deceptive comments made by

17

Officer Conway.[5]  As discussed above, it was Graham who came forward and wanted to cooperate, even before the officers asked him any questions.  Thus, unlike Hart and Beale, this case does not present a situation where an officer was attempting to elicit a confession from a recalcitrant or confused suspect.  To the contrary, from the moment of his arrest, Graham had apparently made a calculated decision that his best option was to cooperate and hope for leniency.  In this respect, and as the Seventh Circuit has noted, "[n]o public policy should castigate a confession of crime merely because it may have been prompted by the hope that cooperation might achieve or increase the changes of a lenient sentence."  United States v. Springer, 460 F.2d 1344, 1347 (7th Cir. 1972).

In sum, we conclude that, under the totality of the circumstances, Graham's statements were not the product of deception or coercion, but were rather the product of a voluntary and calculated decision to cooperate out of self-interest.

### III.

For the reasons set forth above, we conclude that the district court did not err by denying Graham's motion to suppress.  According, we affirm.

**AFFIRMED.**

---

[5]  We express no opinion on whether Conway's comment to Graham – that cooperating would benefit him – contradicted the Miranda warning that anything he said could be used against him; we merely assume this to be true for the sake of argument.  But see United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995) (concluding that there is no such inconsistency).