**UNITED STATES of America, Appellee,**

v.

**Oscar LYNCH, aka Magic,
Defendant–Appellant.**

**No. 1640, Docket 95–1670.**

United States Court of Appeals,
Second Circuit.

Argued May 13, 1996.

Decided Aug. 8, 1996.

Philip Katowitz, New York City, for Defendant–Appellant.

Benton J. Campbell, Assistant United States Attorney, Brooklyn, N.Y. (Zachary W. Carter, United States Attorney for the Eastern District of New York, David C. James, Assistant United States Attorney, of counsel), for Appellee.

Before: MESKILL, CARDAMONE and MINER, Circuit Judges.

MINER, Circuit Judge:

Defendant-appellant Oscar Lynch appeals from a judgment of conviction and sentence entered in the United States District Court for the Eastern District of New York (Raggi, J.), following a jury trial, convicting him of possession of crack cocaine ("crack") with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to possess crack with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846. The district court sentenced Lynch to a 168–month term of imprisonment, a five-year term of supervised release, and a $200 special assessment. On appeal, Lynch contends that the district court erred in finding that he knowingly and voluntarily waived his Fifth Amendment rights. He also contends, *inter alia*, that the district court erred in enhancing his sentence pursuant to U.S.S.G. § 2D1.1(b)(1) for possessing a firearm during the commission of a narcotics offense after he had been acquitted of using and carrying a firearm in relation to a narcotics trafficking crime. Having considered each of Lynch's contentions, we affirm the judgment of the district court.

## BACKGROUND

In November of 1994, the Bureau of Alcohol, Tobacco and Firearms (the "ATF") commenced an investigation of a narcotics distribution enterprise operating out of an apartment building located in Brooklyn, New York. During the course of the investigation, Miguel Espinal, a confidential informant, went to apartment C–9 in the building and made four separate purchases of crack from Lynch, who was known to Espinal by the name "Magic." During two of these transactions, Espinal observed that Lynch was carrying a firearm. On November 29, 1994, while in apartment C–9 purchasing $100 worth of crack from Lynch, Espinal observed that Lynch was carrying a pistol in his pants pocket. On December 19, 1994, while in the apartment purchasing $200 worth of crack from Lynch, Espinal saw Lynch pick up a handgun and carry it with him when he answered a knock at the apartment door.

Espinal made his final purchase of crack from Lynch on December 28, 1994. Espinal entered apartment C–9 and gave Lynch $240 in pre-recorded money in return for 46 vials of crack and $10 in change. Thereafter, ATF agents entered the building and apprehended Lynch as he was descending the stairs leading from apartment C–9. The

agents searched apartment C–9 pursuant to a previously obtained search warrant. In the apartment, the agents found a small quantity of cocaine, a pistol holster, and a bag containing $200 of the pre-recorded money. The agents also searched Lynch and found the remaining $40 of the pre-recorded money in his pants pocket. ATF Agent Anthony Annunziato read Lynch his *Miranda* rights, but did not question Lynch at that time. The agents brought Lynch outside of the building, where Espinal immediately identified Lynch as the individual from whom he had purchased the crack.

Lynch then was transported to ATF headquarters, where he met with Agent Essam Rabadi, who was responsible for "processing" Lynch. The "processing" procedure included searching Lynch, taking his fingerprints, advising him of his constitutional rights, and completing a pedigree form. During this procedure, according to Rabadi, "Lynch was constantly asking questions about the case [and] making general statements about the case," such as: "What is this case all about?" and "How do you guys know[ ] it's me?"

Because Lynch was making statements and asking questions about his case, Rabadi believed that he had "to protect [him]self and advise Mr. Lynch of his constitutional rights before he said anything." Thus, Rabadi read to Lynch an ATF advice of rights form, which contained both a statement of rights section explaining a defendant's constitutional rights and a waiver section stating that the defendant had been advised of his constitutional rights and had chosen to waive those rights.[1] Lynch read the statement of rights section of the form, and then signed the portion of the form acknowledging that he read it. Rabadi then told Lynch that, if he wished to make any more statements or to have his questions answered, he would have to sign the section of the form indicating that he had chosen to waive his constitutional rights. After Lynch read and signed the waiver section, Rabadi asked Lynch several background questions unrelated to the cir-

cumstances of his case and then filled out the pedigree form.

Thereafter, Agent Annunziato met with Lynch. Annunziato first showed Lynch the signed waiver form, and asked Lynch if he wanted to speak to him about the case. Lynch stated that he wished to speak with Annunziato and, during a fifteen-minute interview, stated that he was in trouble, that he had been going to the building for several months, that he was called "Magic," and that he knew the identity of the confidential informant. However, Lynch refused to answer certain questions that were put to him by Annunziato.

On January 24, 1995, a grand jury indicted Lynch, charging him with various narcotics-related offenses and with carrying or using a firearm during and in relation to a narcotics trafficking offense, in violation of 18 U.S.C. § 924(c). On February 24, 1995, Lynch moved to suppress the statements that he made to Annunziato at ATF headquarters, claiming that he had been coerced into executing the waiver section of the form.

The district court held a two-day hearing at which both Annunziato and Rabadi testified regarding Lynch's execution of the waiver section of the form. At the conclusion of the hearing, the district court found that, based "on the facts of this case and from my opportunity to view the witnesses who were involved in this [case]," there was nothing coercive about the manner in which Rabadi gave Lynch the *Miranda* warnings and obtained his waiver. The court found that Lynch knowingly and voluntarily waived his constitutional rights, and, therefore, the court denied the motion to suppress Lynch's statements.

On May 22, 1995, the jury found Lynch guilty of possessing and conspiring to possess crack with the intent to distribute. Lynch was acquitted of using and carrying a firearm during and in relation to a narcotics trafficking crime, in violation of 18 U.S.C. § 924(c). At Lynch's sentencing hearing on November 17, 1995, the district court adjust-

---

1. The waiver section of the form provides:

I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or force of any kind has been used against me. I hereby voluntarily and intentionally waive my rights and I am willing to make a statement and answer questions.

ed Lynch's base offense level upward by two points, pursuant to U.S.S.G. § 2D1.1(b)(1), having found that Lynch possessed a firearm during the commission of the narcotics crimes. The district court sentenced Lynch principally to a 168–month term of imprisonment. This appeal followed.

### DISCUSSION

*1. Voluntary Waiver of Rights*

Lynch contends that the district court erred in denying his motion to suppress the statements that he made to Agent Annunziato at ATF headquarters because the government failed to demonstrate that he knowingly and voluntarily waived his constitutional rights. Specifically, he argues that the district court erred in rejecting his claim that Agent Rabadi coerced him into signing the waiver form by telling him that, if he wished to continue making statements about his case and to have his questions about his case answered by the agents, he would have to sign the waiver form. We reject Lynch's contention.

■ While a district court's conclusion regarding a defendant's waiver of his constitutional rights is subject to *de novo* review, we review the district court's underlying factual findings for clear error. *United States v. Spencer,* 995 F.2d 10, 11 (2d Cir.), *cert. denied,* 510 U.S. 923, 114 S.Ct. 323, 126 L.Ed.2d 269 (1993). A district court's conclusion that a defendant knowingly and voluntarily waived his constitutional rights will be upheld on appeal if "any reasonable view of the evidence supports it." *Id.* (quotations omitted). Whether a defendant knowingly and voluntarily waived his rights "may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir.1991). The government bears the burden of demonstrating by a preponderance of the evidence that a defendant waived his constitutional rights. *Id.; see also Colorado v. Connelly,* 479 U.S. 157, 168–69, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986).

■ Upon a review of the record, we hold that the district court correctly found that Lynch knowingly and voluntarily waived his constitutional rights. The record indicates that Lynch understood both his constitutional rights and the waiver form that he signed. Lynch was advised of his *Miranda* rights on two separate occasions prior to making the statements to Annunziato. Annunziato gave Lynch the *Miranda* warnings at the time of his arrest, and, when asked whether he understood his rights, Lynch nodded his head to indicate that he had understood the *Miranda* warnings. In addition, Rabadi read Lynch the ATF advice of rights form, which contained the *Miranda* warnings and the waiver of rights statement. Lynch read the entire form, stated that he understood the *Miranda* warnings, signed the portion of the form acknowledging his understanding of his rights, and shortly thereafter signed the waiver of rights section. The district court found that Lynch was "mature" and "intelligent," and that he understood his rights and the waiver form. There is nothing in the record indicating the contrary.

The record also demonstrates that Lynch's waiver was voluntary. The fact that Lynch made his statements more than two hours after his arrest suggests that he had time to reflect upon his situation and that he freely chose to waive his rights and to speak with Annunziato. Even after Lynch signed the waiver form, Annunziato asked Lynch whether he wished to speak to him about his case. Moreover, the fact that Lynch answered some of Annunziato's questions and chose not to answer others indicates that Lynch voluntarily agreed to waive his rights and to speak to Annunziato.

■ Finally, we think that Rabadi's statement to Lynch that, if he wished to continue making statements about his case and to have his questions answered, he would have to sign the waiver form, did not render Lynch's waiver of his rights involuntary. It is well settled that "affirmative misrepresentations by the police may be sufficiently coercive to invalidate a suspect's waiver of the Fifth Amendment privilege," *Anderson,* 929 F.2d at 100, but there were no affirmative misrepresentations here. *Anderson* was a

case in which we held that law enforcement agents had coerced the defendant into waiving his rights and making a confession by telling the defendant on three occasions that, if he chose to exercise his right to have an attorney present during questioning, he would not be permitted to cooperate with the government at a later date. The agent told the defendant that "this [is] the time to talk to us, because once you tell us you want an attorney we're not able to talk to you and as far as I [am] concerned, we probably would not go to the U.S. Attorney or anyone else to tell them how much [you] cooperated with us." *Id.* at 97 (alterations in original). We found that this statement was false and misleading because it is common practice for defendants to enter into cooperation agreements with the government after retaining counsel. *Id.* at 100. We explained that the agent's statement may have caused the defendant to develop "a false sense that he must confess at that moment or forfeit forever any future benefit that he might derive from cooperating with the police agents." *Id.* Accordingly, we held that, "[u]nder the totality of the circumstances, [the agent's] statements contributed to the already coercive atmosphere inherent in custodial interrogation and rendered [the defendant's] confession involuntary." *Id.* at 102. *Anderson,* a precedent upon which Lynch relies, is not applicable here.

In the present case, Rabadi testified that Lynch was repeatedly making statements about the case and asking questions such as, "How do you guys know[ ] it's me?" Rabadi believed that, if he had answered Lynch's questions or had engaged Lynch in a dialogue about the evidence in his case before Lynch had signed the waiver form, he would have exposed himself to a claim that his actions constituted improper interrogation under *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980) (stating that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect" (footnote omitted)). Therefore, Rabadi told Lynch that, "if [he] wish[ed] to speak to agents" and to have "[q]uestions pertaining to the investigation" answered, he would have to sign the waiver form.

We think that, under these circumstances, Rabadi's statement to Lynch did not force Lynch into signing the waiver form and making statements to Annunziato. The fact that Lynch was making statements about his case and was asking questions about the evidence in his case after first having been advised of his *Miranda* rights indicates that Lynch was not interested in invoking his constitutional rights and that he wished to talk to Annunziato about his case. In addition, Rabadi's testimony, which was credited by the district court, indicates that Rabadi's only intention was to protect himself by documenting Lynch's waiver of his rights, rather than to pressure Lynch into making a confession.

Moreover, Rabadi's statement to Lynch did not present the same type of ultimatum that was presented to the defendant in *Anderson.* Rabadi's statement to Lynch indicated that, if Lynch wanted the agents to answer his questions *at that moment,* Lynch would have to sign the waiver form. Rabadi's statement to Lynch in no way indicated that, if Lynch did not sign the form, he would "forfeit forever" any future opportunity to have his questions answered by government officials. *Anderson,* 929 F.2d at 100. Accordingly, we think that the district court properly found that, under the totality of the circumstances, Rabadi's statement to Lynch did not render Lynch's waiver of his rights and Lynch's statements to Annunziato involuntary.

We pause to note that there may be circumstances under which a refusal to answer *any* questions posed by a criminal suspect may be considered coercive. Here, it is obvious that Lynch's questions pertained to his crimes, and the government agents wisely sought a voluntary waiver before entering into the discussion that Lynch solicited. It may indeed be misleading as well as coercive, however, for a government agent to indicate that he cannot respond to any sort of question without a waiver of rights.

### 2. The Sentencing of Lynch

Lynch contends that the district court erred in enhancing his sentence pursuant to U.S.S.G. § 2D1.1(b)(1) for possessing a firearm during the commission of a narcotics offense. Specifically, he argues that, because he was acquitted of using and carrying a firearm during and in relation to a narcotics trafficking offense pursuant to 18 U.S.C. § 924(c), it was improper for the district court to enhance his sentence for possessing a firearm. This claim is without merit.

In *United States v. Rodriguez–Gonzalez*, 899 F.2d 177 (2d Cir.), *cert. denied*, 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990), this Court rejected nearly the same argument that Lynch advances here and affirmed an enhancement of the defendant's sentence pursuant to § 2D1.1(b)(1) for possession of a firearm where the defendant had been acquitted of a § 924(c) charge. We explained that, because an "[a]cquittal does not have the effect of conclusively establishing the untruth of all of the evidence introduced against the defendant" and because "disputed sentencing factors need only be proved by a preponderance of the evidence," the district court was entitled to consider evidence that the defendant had engaged in conduct that was the subject of an acquittal. *Rodriguez–Gonzalez*, 899 F.2d at 181–82 (quotations omitted and alteration in original); *see also United States v. Concepcion*, 983 F.2d 369, 388–90 (2d Cir.1992), *cert. denied*, 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993). Accordingly, we reject Lynch's claim that the district court erred in enhancing his sentence by considering criminal activity for which he had been acquitted.

On the record before us, we conclude that there was ample evidence for the district court to have found by a preponderance of the evidence that Lynch possessed a firearm during the commission of a narcotics offense. Espinal testified that, on two separate occasions, he saw Lynch carrying a firearm in apartment C–9 during the course of narcotics transactions. The district court found this testimony of Espinal credible. In addition, the ATF agents recovered a gun holster from apartment C–9 on the day that Lynch was arrested. Accordingly, the district court properly enhanced Lynch's sentence pursuant to § 2D1.1(b)(1).

### CONCLUSION

We have considered Lynch's remaining contentions, and we find them all to be without merit. In view of the foregoing, we affirm the judgment of the district court.