UNITED STATES of America,
Plaintiff,

v.

Abdel Hameed SHEHADEH,
Defendant.

No. 10–cr–1020 (ENV).

United States District Court,
E.D. New York.

Aug. 22, 2012.

Jeffrey G. Pittell, Great Neck, NY, for Defendant.

## MEMORANDUM & ORDER

VITALIANO, District Judge.

Defendant Abdel Hameed Shehadeh stands charged in a three-count indictment of making material false statements to government agents in a matter involving international terrorism, in violation of 18 U.S.C. § 1001(a)(2). At the heart of this case is the government's accusation that Shehadeh traveled to Pakistan in 2008 to join a violent insurgent group and, thereafter, lied to federal agents about the purpose of his trip. Before the Court now is Shehadeh's motion to suppress post-arrest statements made to law enforcement officers. Shehadeh claims his Fifth Amendment right to counsel under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was violated because his waiver of that right was coerced. He seeks suppression of all statements made after the alleged involuntary waiver of his right to counsel during custodial interrogation and of his concomitant right to remain silent. For the reasons stated below, defendant's motion is denied.

## BACKGROUND

Shehadeh is a 23 year-old Muslim man; he is a United States citizen, born and

raised in New York City. Following a period of government investigation and surveillance spanning more than two years, Shehadeh was arrested in Hawaii on October 22, 2010. A criminal complaint charging him with three counts of lying to federal agents had issued.[1] After his arrest, defendant was taken to the headquarters of the Federal Bureau of Investigation ("FBI") in Honolulu, where he made statements to government agents over the course of a four-hour interrogation.

■ On December 27, 2011, defendant moved to suppress those statements as the fruits of an involuntary waiver of his Fifth Amendment right to counsel.[2] (Dkt. Nos. 44–46). That initial motion was founded on statements allegedly made to Shehadeh by an Assistant U.S. Attorney, Ali Kazemi ("Kazemi"), during the October 22 interrogation. Shehadeh claimed Kazemi had told him that, in sum and substance, if he asked for an attorney, his arrest would become public and any chance of release would vanish. (Dkt. No. 45 at 1.) The government denied that the alleged statements were ever made. The Court ordered and then held an evidentiary hearing on February 16, 2012.

The government called two witnesses: Kazemi and FBI Special Agent John Tinning, who was the case agent for the government's investigation of Shehadeh and was present for the duration of the interrogation. Over the course of direct and cross-examination, the government's witnesses provided similar testimony—consistent even in subtle details—as to what transpired during Shehadeh's interrogation. Cemented in that credible testimony, but based on the entire record, the Court finds the pertinent facts to be as follows:

At some point not long after his arrest, Shehadeh was brought to a room in the FBI's Honolulu headquarters. Once in the interrogation room, defendant was handcuffed to a bar attached to the wall. The room was approximately 12 feet by 12 feet and contained a desk, several chairs, and a dresser. (Transcript of 2/16/12 Hearing ("Tr.") at 47.) At approximately 3:38 in the afternoon (local time), Agent Tinning, along with Detective Angel Maysonet of the New York City Police Department, entered the room where defendant was held.[3] Agent Tinning testified that, after removing defendant's handcuffs, the three exchanged introductions and pleasantries. He described the atmosphere in

---

**1.** A grand jury in this district subsequently returned an indictment charging Shehadeh with three counts of violating 18 U.S.C. § 1001(a)(2), which states, in relevant part: [W]hoever, in any matter within the jurisdiction of the executive ... branch of the Government of the United States, knowingly and willfully ... makes any materially false, fictitious, or fraudulent statement or representation ... shall be fined under this title ... or, if the offense involves international or domestic terrorism ... imprisoned not more than 8 years, or both.

**2.** Shehadeh originally argued that his Sixth Amendment right to counsel had been violated as well. Following the hearing of February 16, 2012, *see infra,* defendant appears to have abandoned that argument. In any case,

defendant's Sixth Amendment right to counsel did not attach—and thus, could not have been violated—until his arraignment on October 25, 2010. *Rothgery v. Gillespie Cnty. Tx.,* 554 U.S. 191, 198, 213, 128 S.Ct. 2578, 171 L.Ed.2d 366 (2008); *United States v. Moore,* 670 F.3d 222, 234 (2d Cir.2012) ("Absent a formal charge, arrest on a warrant, even one issued pursuant to a criminal complaint sworn out by prosecutors, is insufficient [to trigger attachment of a defendant's Sixth Amendment's right to counsel] prior to the initial appearance before a judicial officer.").

**3.** Both Agent Tinning and Detective Maysonet were investigating Shehadeh as members of the New York Joint Terrorism Task Force based in New York City.

the room at that point as cordial enough that defendant joked briefly with the agents about their lack of proper Hawaiian attire. (*Id.* at 15, 47, 50.) Kazemi was surreptitiously observing the goings-on from a separate room using a live video and audio feed. (*Id.* at 14.)

At approximately 4:00 P.M., Agent Tinning began to inform Shehadeh of his *Miranda* rights using a standard FBI form. (*See* Gov't Ex. 1.) This process took at least 15 minutes; a rote *Law and Order*-style recitation of *Miranda* rights could doubtless be accomplished in much shorter time. It is undisputed, though, that Agent Tinning's review was interspersed with questions from Shehadeh (*see* Tr. at 16, 51, 56), as well as Agent Tinning's commentary on Shehadeh's Fifth Amendment rights (*see id.* at 17, 52, 54, 71, 83–84). As Tinning walked defendant through the form explaining his rights, Tinning also explained some other aspects of defendant's situation. Other than as to time and geography, of course, defendant's custodial situation was unremarkable.

First on his codicil to the FBI's standard form *Miranda* advice, Tinning attempted to explain to Shehadeh about the possibility of cooperating with the government. (*Id.* at 52.) Tinning told Shehadeh that "he didn't think he was considering" this option and illustrated cooperation by telling him the story of Frank Abagnale, a well-known FBI informant who had been featured in the 2002 movie, "Catch Me If You Can." (*Id.* at 17, 53–54.) He then explained to Shehadeh that the ability to speak to his "case agent" (himself) face-to-face was an "opportunity that wasn't going to last forever, it was going to be a short window; at some point lawyers were going to get involved." (*Id.* at 52; *see also id.* at 71, 83–84.) Agent Tinning described this arrestee/agent interaction more than once during his suppression hearing testimony,

perhaps most clearly in response to the Court's own inquiry:

THE COURT: Okay. I have a question. I may have missed this, I apologize. You identified . . . that you made a comment about lawyers.

TINNING: Yes, Your Honor.

THE COURT: What was that comment about?

TINNING: I told Mr. Shehadeh that, this is in conjunction of his right that he had a right to stop answering questions at any time. That it was an opportunity not only to be asked questions but also to ask questions of me. This was an opportunity to ask questions before the lawyers got involved. And it was a limited opportunity. That once that opportunity passed, it wouldn't happen again. He no longer would have that opportunity, to ask questions about his case directly, face-to-face with me.

THE COURT: Without a lawyer, or period?

TINNING: Without a lawyer. That is the context, Your Honor, that we can speak plainly face-to-face before the lawyers get involved. That's what I told him.

(*Id.* at 83–84.) Tinning had earlier clarified that this was in the context of explaining "the fourth right of Miranda" (*id.* at 71), which corresponds on the FBI form to the statement "You have the right to have a lawyer with you during questioning" (*see* Gov't Ex. 1).

Shehadeh was no wilting flower during Tinning's drawn-out explication of the *Miranda* rights; he interrupted several times to ask questions and make comments. He asked if he would be given the opportunity to ask for a lawyer. (*Id.* at 16, 51.) He stated, "I know the smart move is not to talk." (*Id.* at 16.) He also asked if he could make a statement "off the record" (*id.* at 16, 56), to which Tinning responded

by telling him that any statement would have to be "on the record" (*id.* at 17). Through this point in the interrogation, Shehadeh had related that he accurately understood his predicament and his choices; Tinning also had accurately acknowledged and described Shehadeh's rights.

After about 30 minutes in the room, as Tinning recalled it, defendant did not "appear to understand what I was telling him about cooperation. And I remember saying, 'I don't think you understand what I'm telling you.' That's when Detective Maysonet said, 'We brought an attorney with us, he's on our team. He can answer your questions. Do you want to speak with him?" (*Id.* at 56.) When Shehadeh responded that he would like to hear his rights explained by the prosecutor rather than the law enforcement officers, Detective Maysonet brought Kazemi into the room. (*Id.* at 57.) It was certainly not the most provident act in the play.

AUSA Kazemi identified himself as a prosecutor and then moved on to explain several aspects of the federal prosecution process to Shehadeh. (*Id.* at 23–24, 57). Kazemi described for Shehadeh what would soon unfold, including Shehadeh's initial appearance in Hawaii, his removal to New York, the possibility of an indictment, and post-indictment options, covering trial, a guilty plea, cooperation (including the possibility of a "5K letter"), and sentencing. (*Id.* at 21–24.) Kazemi additionally advised Shehadeh that in Kazemi's "experience, and the experience of the [U.S. Attorney's Office], generally speaking, defendants who appear for sentencing before a judge, who have cooperated and who have a 5K letter, are in the best position to be sentenced." (*Id.* at 24.) On at least one occasion, the AUSA admonished defendant that he should or could seek legal counsel and that he, Kazemi,

was not there to offer him any legal advice. (*Id.* at 20, 58). Moreover, both Kazemi and Tinning testified (and the Court accepts their testimony) that the statement attributed to Kazemi by defendant in his original moving papers was never uttered by Kazemi or anyone else during the interrogation. (*Id.* at 25, 61.) Aside from Shehadeh's bald assertion that Kazemi wrongly told him that if he asked for counsel there would be no chance to avoid arrest and prosecution, which the Court has found as a matter of fact did not occur, there is no evidence whatsoever that the prosecution misinformed defendant of his *Miranda* rights. It is equally clear that in the course of providing Shehadeh with an accurate, nonmisleading and protracted explanation of his *Miranda* rights, Kazemi, Tinning and Maysonet were attempting a ploy to persuade Shehadeh to waive his right to counsel and otherwise cooperate with their investigation.

After over an hour of speaking to defendant, Kazemi left the room. Shortly thereafter, Tinning re-read the advice of rights form to Shehadeh and defendant signed a waiver of those rights. Shehadeh spoke to Tinning and Maysonet for just over an hour before he briefly decided to stop talking. Within 15 minutes though, Shehadeh had signed a second waiver form and began talking again. As he spoke to the investigators following his waivers, Shehadeh made numerous statements relevant to the crimes alleged. They are the object of this suppression motion.

In the aftermath of the February 16 hearing, defendant submitted a second motion to suppress based on the testimony of the government's own witnesses. Though defendant's theory shifted in light of the clarification of facts and statements developed at the hearing, the motion's core argument is essentially unchanged: the government's misconduct rendered Sheha-

deh's ostensible waiver of his Fifth Amendment rights coerced and involuntary. As amplified by the second motion, it is that issue the Court now decides.

## DISCUSSION

■ Shehadeh's motion spotlights the propriety of the government's statements made during the course of custodial interrogation "in the context of their impact on the voluntariness of" of his waiver. *See United States v. Anderson*, 929 F.2d 96, 98 (2d Cir.1991). "The purpose of the *Miranda* warning is to ensure that the person in custody has sufficient knowledge of his ... constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *United States v. Carter*, 489 F.3d 528, 534 (2d Cir.2007).

■ "The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion. Indeed, the Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion. The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Colorado v. Connelly*, 479 U.S. 157, 169–70, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (citations and quotations omitted). "Cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Dickerson v. United States*, 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). However, though "[p]loys to mislead a suspect or to lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda's* concerns," *Illinois v. Perkins*, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990), "affirmative misrepresentations by the police may be sufficiently coercive to invalidate a suspect's waiver of the Fifth Amendment privilege," *Anderson*, 929 F.2d at 102. Because custodial interrogation contains "pressures that cause a suspect to speak when he would otherwise remain silent, the prosecution must show that this safeguard of informing the accused of his rights was actually employed, so that a right enshrined in the words of the Constitution is not lost in the reality of the street." *Id.* at 98–99

■ "To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States v. Male Juvenile (95–CR–1074)*, 121 F.3d 34, 39–40 (2d Cir. 1997) (quoting *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir.1995)). The government must show that a waiver was knowing and voluntary "by a preponderance of the evidence." *United States v. Lynch*, 92 F.3d 62, 65 (2d Cir.1996); *see also Connelly*, 479 U.S. at 168–69, 107 S.Ct. 515. Though a signed *Miranda* waiver is "usually strong proof" that a suspect has voluntarily waived his rights, it is by no means conclusive on the issue. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Only if the totality of the circumstances "reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Whether a statement has been coerced is determined by evaluating the "totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of

law enforcement officials." *Anderson,* 929 F.2d at 99; *see also United States v. Orlandez–Gamboa,* 320 F.3d 328, 332 (2d Cir. 2003); *Lynch,* 92 F.3d at 65. "The cynosure of this analysis is, moreover, whether the agents ... engaged in 'wrongful acts' to obtain a coerced confession." *United States v. Paracha,* No. 03–cr–1197, 2004 WL 1900336, at *4 (S.D.N.Y. Aug. 24, 2004) (citing *Connelly,* 479 U.S. at 165, 107 S.Ct. 515), *aff'd,* 313 Fed.Appx. 347 (2d Cir.2008). "No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Orlandez–Gamboa,* 320 F.3d at 332.

### A. Characteristics of the Accused

■ At the time of his interrogation, Shehadeh was approximately 21 years-old and, the evidence shows, had *at least* a basic appreciation of the circumstances surrounding his arrest. Importantly, he indicated an awareness of his rights through questions he asked interrogators regarding an opportunity to consult an attorney of his own (Tr. at 16, 21) and the statement he made that he had a right not to say a word (*id.* at 16 ("I know the smart move is not to talk.")).[4] Shehadeh's request to make a statement "off the record" (*id.* at 16, 56) squarely indicates an awareness that statements he might otherwise make could be used against him. It also suggests a level of comfort with the government's agents so as to attempt to strike a bargain of sorts.

Such comfort with his interrogators was undoubtedly a result of the nearly two-dozen interviews Shehadeh granted—voluntarily, it is uncontested on this motion—to investigators over the two years preceding his arrest. (*Id.* at 82–83.) *See also United States v. Scarpa,* 897 F.2d 63, 68–69 (2d Cir.1990). Indeed, Shehadeh apparently felt so comfortable with and tuned-in to those investigating him, that he expressed surprise that he was incorrect in his expectation that he would be arrested on Saturday, October 23, as opposed to Friday, when he actually was arrested. (Tr. at 50.) This same sense of comfort with law enforcement manifested itself in Shehadeh's willingness to joke with Tinning and Maysonet, and even poke fun at their failure to assimilate to Hawaiian fashion standards. (*Id.*).

In a nutshell, the essentially uncontradicted evidence at the hearing shows that Shehadeh is a young man of at least average intellectual ability, who displayed both comfort with and confidence in his ability to interact with law enforcement, even in an FBI interrogation room following an arrest complete with handcuffs. *See Scarpa,* 897 F.2d at 69. He was also generally familiar with *Miranda's* "rules of engagement": he knew he had a choice between saying something or saying nothing at all; he knew he was entitled to speak to a lawyer who would represent only his interests and not those of the prosecution or anyone else; and he knew that incriminating statements could be used to his detriment. With all of this in mind, Shehadeh joked, teased, inquired, and, albeit unsuccessfully, tried to bargain for a situation in which he would feel most comfortable talking. *Id.* His own words to the terrorism task force investigators—from early in the interrogation—belie his assertion that his *Miranda* waiver was not knowing and vol-

---

**4.** Shehadeh's inquiry as to whether he would "have the opportunity to ask for a lawyer" was clearly not sufficiently unambiguous and unequivocal to have invoked his right to counsel. *See Davis v. United States,* 512 U.S. 452, 461–62, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

untary and that he was coerced "to speak when he would otherwise remain silent," *Anderson,* 929 F.2d at 98–99: "I want to tell you my story. I will tell you my story." (Tr. at 56.) These words were spoken with more than a modicum of knowledge that he was not required to speak, could consult his own attorney, and that if he said anything, the prosecutor could use it against him to show that he was guilty of a crime.

## B. Conditions of Interrogation

▇ Next for review are the physical conditions and circumstances of interrogation. *Anderson,* 929 F.2d at 99; *see also Lynch,* 92 F.3d at 65. Defendant's interrogation took place in a relatively small, nondescript room at the FBI's Honolulu office. "The fact that the questioning took place in close quarters is not significant in determining whether" Shehadeh's waiver was voluntary. *Anderson,* 929 F.2d at 99. Defendant was not handcuffed while he spoke to the agents and, by all accounts, the atmosphere in the room was "relaxed," "cordial," and professional. (Tr. at 14–15, 47, 50.) Though the conditions of interrogation here do not *per se* suggest undue coercion, nothing in the evidence suggests a diminishment of the " 'compelling pressures[ ] [already] inherent in custodial police interrogation,' " *Dickerson,* 530 U.S. at 440, 120 S.Ct. 2326 (quoting *Miranda,* 384 U.S. at 467, 86 S.Ct. 1602). "Standing alone, the conditions of interrogation in this case do not point either way." *Anderson,* 929 F.2d at 99.

## C. Conduct of Law Enforcement

Without surprises, if there is a brass ring for Shehadeh to grasp, it must hang from the conduct of the interrogators. Saddled with the burden on this motion to prove Shehadeh's waiver was knowing and voluntary, *see Lynch,* 92 F.3d at 65, the testimony of the government's witnesses regarding law enforcement's conduct during defendant's interrogation lies thin at times. Close scrutiny is required to ensure that prosecution team members did not make the "kinds of misleading statements" that pose a sufficiently "serious constitutional problem" that demands a remedy. *Anderson,* 929 F.2d at 100.

Essential to review are statements made to Shehadeh regarding his consultation with counsel, especially those of Agent Tinning. Tinning candidly admitted—and his contemporaneous notes confirm—that in the course of explaining the right of a suspect in custody to have an attorney with him during questioning, Tinning told Shehadeh his ability to "speak plainly," "face-to-face" with his "case agent" would be of limited duration and, critically, would evaporate when "the lawyers [got] involved." (Tr. at 84; *see also id.* at 52, 71, 83–84; Gov't Ex. 3500–JT–5.) This followed discussion of cooperation and took place during, not after, the advice of rights. Defendant argues that, under the totality of the circumstances, this statement—followed by AUSA Kazemi's "explanation" of the legal process—fundamentally misrepresented his rights and coerced him into waiving them because these statements suggested any opportunity to cooperate was conditioned on doing so before "the lawyers get involved."

In *United States v. Anderson,* 929 F.2d 96, the Second Circuit affirmed a district court's suppression of a defendant's statement where, after the defendant had been Mirandized but prior to his making a statement, a government agent told him " 'this [is] the time to talk to us, because once you tell us you want an attorney we're not able to talk to you and as far as I [am] concerned, we probably would not go to the U.S. Attorney or anyone else to tell them how much [you] cooperated with

us." *Id.* at 97. "The 'if you want a lawyer you can't cooperate' language was repeated three times" before the defendant made several incriminating statements. *Id.* Suppression was appropriate, the Court reasoned, due to the "false and/or misleading" nature of the agent's statements regarding the defendant's ability to get a lawyer if he wanted to cooperate. *Id.* at 100. In *Anderson,* the government's "affirmative misrepresentations," *id.* at 100, "contributed to the already coercive atmosphere inherent in custodial interrogation and rendered [the defendant's] ... confession involuntary as a matter of law," *id.* at 102.

There is, as case law teaches, a line separating tolerable deception from unconstitutional coercion. *See Perkins,* 496 U.S. at 297, 110 S.Ct. 2394 ("Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns."); *see also*

*Anderson,* 929 F.2d at 100.[5] Yet, Tinning testified, in no uncertain terms, that he juxtaposed Shehadeh's ability to attain a presumable benefit, namely, to ask questions and "speak plainly" to the agent in charge of his case, with a decision not to exercise his Fifth Amendment right to ask for a lawyer. Making matters worse, Agent Tinning advised defendant of this purported "choice" *during* the initial advisement of *Miranda* rights, straying from a rote but plain recitation of them. *Miranda* warnings reflect a "constitutional rule," *Dickerson,* 530 U.S. at 444, 120 S.Ct. 2326, meant to safeguard a defendant's right against self-incrimination, *id.* at 439, 120 S.Ct. 2326. Injections by the government of interpretive—and potentially misleading—commentary into *Miranda*'s baseline warnings undermine the prophylactic effects of *Miranda*'s procedural mandate. *See United States v. Wysinger,* 683 F.3d 784, 800 (7th Cir.2012) [6]; *Hart v.*

---

**5.** During the hearing, the government represented that, at a point in time prior to Shehadeh's arrest, investigators employed a ruse to lead Shehadeh to believe he was working *with* government agents. Defendant makes no argument, nor is there anything in the record to suggest, that the ruse or any other pre-arrest contact between Shehadeh and government agents is relevant to the matters in issue on this motion.

**6.** In *Wysinger,* the Seventh Circuit suppressed statements made during custodial interrogation despite [the defendant] having been Mirandized prior to questioning. A portion of the statements were suppressed because they followed an unequivocal invocation of the defendant's right to counsel. 683 F.3d at 796. The Seventh Circuit, however, went further: it also suppressed statements made prior to the defendant invoking his right to counsel due to the misleading nature of the *Miranda* warnings employed. *Id.* The Court held that "an incorrectly worded *Miranda* warning ... followed by diversionary tactics that redirect the suspect away from asserting those rights, frustrates the purpose of the *Miranda* protec-

tions. *Id.* at 800 (citing *Missouri v. Seibert,* 542 U.S. 600, 621–22, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004)). The court succinctly summarized the circumstances that lead it to suppress the defendant's statements:

> In sum, after [defendant] asked in the first minute of the interrogation if he should call a lawyer, [the government agent] first told [him] that they were 'going to talk about that,' and then read a potentially misleading version of his rights, one that put [defendant] to the false choice of talking to a lawyer before questioning or having a lawyer with him during questioning.... The agent then narrowed [defendant]'s options even further, telling him he had two choices, namely cooperating or being charged with conspiracy. The agent failed to mention that [defendant] had two other options: to remain silent, or to consult a lawyer immediately and to have one with him during the interrogation.

*Id.* at 803. Though *Wysinger* has much to teach about subtleties of language as they come to bear in custodial interrogations, it does not dispose of the issues here. In addition to being merely persuasive, but not con-

*Attorney General of State of Florida,* 323 F.3d 884, 893 (11th Cir.2003).

Surely, while not crossing the line as defendant protests, Agent Tinning's brief, one-time commentary about the "effects" of asking for a lawyer during post-arrest, custodial interrogation comes as close to the line demarcated by *Anderson* as possible. This is especially true in light of the subsequent appearance of AUSA Kazemi, whose in-custodial speech made clear that Shehadeh's fundamental choice was between cooperation and conviction. Unlike in *Anderson,* however, the Court finds that, under all the circumstances, Tinning's commentary was neither false nor misleading. Specifically, since Agent Tinning's colloquy with Shehadeh was actually true and was not misleading (*i.e.,* he never told Shehadeh that "cooperation" leading to a better result for him was not possible if he asked for a lawyer), it does not support a finding of undue coercion. Stated differently, in *Anderson,* the agent misrepresented the nature of the defendant's rights should he get a lawyer (*i.e.,* "get a lawyer and the possibility to cooperate will be a nullity"), *see also United States v. Checo,* No. 02 CR. 968, 2003 WL 194207, at *2 (S.D.N.Y. Jan. 28, 2003); here, to the contrary, Tinning's comment about lawyers simply suggested that the current, casual nature of Shehadeh's interactions with the government would change in tenor.[7] (Tr. at 84:4–10.) This is a far cry from the explicit and repetitive advice in *Anderson* that asking for a lawyer would categorically foreclose cooperation.

Nor, under all the circumstances, did AUSA Kazemi's behavior transgress constitutional propriety. As an initial matter, the Court credits Kazemi's testimony that he was unaware of Agent Tinning's comments regarding lawyers when he entered the room. (Tr. at 38.) While Kazemi's decision to enter the interrogation process was—charitably—improvident, it hardly abridged Shehadeh's constitutional rights. So long as there was no attempt to undermine *Miranda's* litany of rights, *see Seibert,* 542 U.S. at 618, 124 S.Ct. 2601, nothing in *Miranda* bars a prosecutor from administering the *Miranda* warnings to a defendant in custody, *see In re Terrorist Bombings of U.S. Embassies in E. Africa,* 552 F.3d 177, 182–82, 210–11 (2d Cir.2008). To be sure, the use of ploys or ruses by attorneys, especially government prosecutors, is a matter of grave ethical concern. *See, e.g., United States v. Hammad,* 858 F.2d 834, 839 (2d Cir.1988). The Court finds, though, that such issues are not sufficiently supported here. For the purposes of evaluating the constitutional integrity of the advice regarding defendant's Fifth Amendment rights, Kazemi told Shehadeh that he was not on his side; he did not misstate defendant's rights; nor did Kazemi directly participate in planning or executing any ruse to extract a waiver or

---

trolling, precedent, that case dealt specifically with actual modifications to the *Miranda* warnings themselves causing an incorrect statement of the defendant's rights. Here, on the other hand, Shehadeh received technically proper warnings and there is nothing in the record suggesting that any of the agents or AUSA Kazemi here attempted to divert Shehadeh from exercising his constitutional rights. Where the ice is thin was the truthful advice that continued one-on-one conversations with investigating agents would not occur once Shehadeh was represented by coun-

sel, practically an *ipse dixit.* That is a far cry from *Wysinger,* where the actual advice of rights was incorrectly—and misleadingly— worded, and *Anderson,* where the defendant was told he would forever forego the opportunity to cooperate if he requested the advice of counsel.

**7.** Tinning's statement, moreover, was a one-off comment; one of the several problems in *Anderson* was the repetition of the government's misrepresentative ultimatum. *Anderson,* 929 F.2d at 97; *see also Lynch,* 92 F.3d at 65–66.

coerce Shehadeh "to speak when he would otherwise remain silent." [8] *Anderson,* 929 F.2d at 98–99. Indeed, in participating in the *Miranda* advisement to Shehadeh, Kazemi told him at least twice that he had a right to consult with his own lawyer.

### D. Shehadeh's Waiver Was Knowing and Voluntary

Under the totality of the circumstances, the Court is satisfied that Shehadeh's waiver of his Fifth Amendment rights was based on full, accurate and nonmisleading advice explaining those rights, was voluntary and was with a full awareness of the consequences of his waiver. The interrogation process employed, however, leaves much to be desired. It was fraught with constitutional and other legal pitfalls. It is to be avoided. Nonetheless, on the totality of the circumstances, the Court finds the government has proved by a preponderance of the evidence that Shehadeh's waiver was uncoerced, knowing and voluntary.

### CONCLUSION

For the foregoing reasons, defendant's motion to suppress his post-arrest statements is denied in its entirety.

**SO ORDERED.**

---

[8.] This is not to say that Kazemi, just like Tinning and Maysonet, did not attempt to cajole Shehadeh to cooperate immediately and, as was Shehadeh's right, to do so without waiting to consult an attorney. It is to say there is no evidence that Kazemi did so by artifice or scheme to deceive. Bluntly, participation in such tactics before the administration of *Miranda* warnings and the signing of a waiver of the right to counsel is to navigate in a narrow channel between ethical improprieties and professional misconduct. That AUSA Kazemi was able to complete the journey without sustaining a hit is near-miraculous.